## STATE OF CONNECTICUT *v.* HECTOR GONZALEZ (12976)

PETERS, C. J., HEALEY, SHEA, GLASS and COVELLO, Js.

Argued November 4, 1987—decision released February 9, 1988

*Suzanne Zitser,* assistant public defender, with whom, on the brief, was *Joette Katz,* public defender, for the appellant (defendant).

*Frederick W. Fawcett,* assistant state's attorney, with whom, on the brief, were *Donald A. Browne,* state's attorney, and *Jonathan C. Benedict,* assistant state's attorney, for the appellee (state).

COVELLO, J. On November 1, 1985, a jury found the defendant, Hector Gonzalez, guilty of capital felony in violation of General Statutes § 53a-54b (8)[1] and attempted murder in violation of General Statutes §§ 53a-49[2] and 53a-54a.[3] The defendant appeals from the judgment of conviction and claims that the trial court erred in (1) concluding that the defendant knowingly and intelligently waived his constitutional right against self-incrimination, (2) refusing to dismiss the prosecution against him based on the loss or destruction of physical evidence and refusing to instruct the jury on adverse inferences they could draw from the unexplained disappearance of this evidence, and (3) instructing the jury on circumstantial evidence. We find no error.

The jury could reasonably have found that on the morning of May 6, 1983, police responded to a call and discovered two men who had been shot to death in a

---

[1] General Statutes § 53a-54b provides in part: "CAPITAL FELONY. A person is guilty of a capital felony who is convicted of any of the following . . . (8) murder of two or more persons at the same time or in the course of a single transaction."

[2] General Statutes § 53a-49 provides in part: "CRIMINAL ATTEMPT: SUFFICIENCY OF CONDUCT; RENUNCIATION AS DEFENSE. (a) A person is guilty of an attempt to commit a crime if, acting with the kind of mental state required for commission of the crime he: (1) Intentionally engages in conduct which would constitute the crime if attendant circumstances were as he believes them to be; or (2) intentionally does or omits to do anything which, under the circumstances as he believes them to be, is an act or omission constituting a substantial step in a course of conduct planned to culminate in his commission of the crime."

[3] General Statutes § 53a-54a provides in part: "MURDER DEFINED. AFFIRMATIVE DEFENSES. EVIDENCE OF MENTAL CONDITION. CLASSIFICATION. (a) A person is guilty of murder when, with intent to cause the death of another person, he causes the death of such person or of a third person . . . ."

Bridgeport apartment. A third victim, Roberto Marin, had survived the shooting and had been taken to the hospital before the police arrived. Police observed a car speeding away from the area of the crimes and, between 9:30 and 10 that morning, brought the driver, Jose "Willy" Rivera, to the police station. Rivera wore a T-shirt which bore "sprinkles" of blood, but, in an interview with detectives, he denied any knowledge of the shootings. Rivera gave the T-shirt to the police for laboratory testing of the stains.

Later that morning, a detective interviewed Marin at the hospital. Marin declared that while Rivera had been present at the attack, it was "Iran" who had shot him and the two other victims. The detectives then interviewed Rivera again. During this second meeting, Rivera admitted having been present during the shootings and identified "Iran" as the nickname of the defendant, Hector Gonzalez. Rivera stated further that "Iran" had done all the shooting.

On the basis of this information, Bridgeport police located and arrested the defendant later that day. The police read him his *Miranda* rights in English during the ride to the police station. Upon arrival, Inspector Anthony Fabrizi advised the defendant of his rights in Spanish. After inquiring whether the defendant had understood his rights, and receiving an affirmative response, Fabrizi asked the defendant in Spanish and in English whether he would be willing to make a statement concerning the circumstances surrounding the shootings. The defendant admitted one of the shootings and then related his version of the events in English that the police understood without difficulty.[4] The

[4] The defendant's complete version of events was that he had been in a pool hall next door to the apartment in which the victims were found when, at about 2:20 a.m., a "Cuban man" asked him to step outside. Three men who had been waiting for them pushed the defendant and the Cuban man into the apartment. One of the men held the Cuban man, one man held

defendant claimed that a third person, whom he identified as the "Cuban man," shot the two victims following a robbery in the victims' apartment. The "Cuban man" then tossed the gun to the defendant, who then shot Marin accidentally. Upon Fabrizi's request, the defendant agreed to give a written statement.

Lieutenant Frank Nerkowski obtained the defendant's written statement with the assistance of a fellow Bridgeport employee who translated. After Nerkowski readvised the defendant of each *Miranda* right, his colleague translated the right into Spanish and asked the defendant if he understood the right. The defendant indicated each time that he did. The defendant then gave his statement concerning the shootings and Nerkowski typed the statement as the defendant spoke. The translator read the statement to the defendant, who then signed it.

## I

The defendant first claims that the trial court erred in denying, after a hearing, his motion to suppress his oral and written statements given to the police after his arrest. The defendant alleges that he was unable to execute a knowing and intelligent waiver of his constitutional rights under *Miranda* v. *Arizona,* 384 U.S. 436, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966), and that his incriminating statements were made involuntarily.

The defendant concedes that his *Miranda* rights were explained to him in the police car at the time of his arrest and again after arrival at the police station

a knife to the defendant's throat, and the third man robbed the defendant of $205 from his wallet and his jewelry. The Cuban man then took a gun from the attache case he was carrying and shot two of the men dead, and then handed the gun to the defendant, telling him to "defend [him]self." The defendant concluded this recital of the events by declaring: "I got nervous because I didn't want to do it but the gun went off accidentally and I shot the man."

before any of his statements were made. He claims, however, that he was intellectually incapable of understanding, and consequently, of waiving his *Miranda* rights. The defendant bases this claim on (1) his limited facility with the English language, and (2) results of psychological testing that characterized him as falling within the "dull normal" range of intelligence.

Where, as here, a defendant claims that his statement was "obtained in violation of our *Miranda* doctrine, the [s]tate need prove waiver only by a preponderance of the evidence." *Colorado* v. *Connelly,* 479 U.S. 157, 168, 107 S. Ct. 515, 93 L. Ed. 2d 473 (1986); see also *State* v. *Pecoraro,* 198 Conn. 203, 208, 502 A.2d 396 (1985). To be valid, a waiver must be voluntary, knowing and intelligent. "Whether a purported waiver satisfies these requirements is a question of fact in which the circumstances of the particular case, including the record of the defendant's conduct in police custody, should be considered." *State* v. *Boscarino,* 204 Conn. 714, 743, 529 A.2d 1260 (1987).

In support of his argument that he was intellectually incapable of making a knowing and intelligent waiver of his *Miranda* rights, the defendant presented testimony from a clinical psychologist for the city of Hartford, a graduate student in Spanish who was a teaching associate, and a physician specializing in neurology and psychiatry. The psychologist testified as to intelligence testing she had performed on the defendant that indicated that he had "low" comprehension of verbal material. The physician testified as to neurological and psychiatric findings he had made after examining the defendant. He stated that his "major finding" on the neurologic examination was the defendant's reduced ability to perceive pin prick and vibration sensations on the right side of his body, which indicated damage to the left hemisphere of his brain. On the basis of the results of his psychiatric examination, the phy-

sician found the defendant to have a thought disorder characterized by too many thoughts at one time and "thoughts which go too fast," accompanied by an inability to deal effectively with stress.

We agree with the trial court's conclusion that the expert testimony was not necessarily determinative of the defendant's ability to execute a knowing and intelligent waiver.[5] See *State* v. *Boscarino,* supra, 744. Examination of the record convinces us that the trial court's finding of a valid waiver is supported by substantial evidence. *State* v. *Barrett,* 205 Conn. 437, 451, 534 A.2d 219 (1987); *State* v. *Frazier,* 185 Conn. 211, 219, 440 A.2d 916 (1981), cert. denied, 458 U.S. 1112, 102 S. Ct. 3496, 73 L. Ed. 2d 1375 (1982). The defendant conceded "that he had been read, and had acknowledged his understanding of, his *Miranda* rights." *North Carolina* v. *Butler,* 441 U.S. 369, 373, 99 S. Ct. 1755, 60 L. Ed. 2d 286 (1979); see *State* v. *Boscarino,* supra; *State* v. *Chung,* 202 Conn. 39, 48, 50, 519 A.2d 1175 (1987). Although the defendant spoke clear and understandable English, the police, out of an abundance of caution, advised him of his constitutional rights in both English and Spanish. During the translation of the rights form into Spanish, the translator paused after reading each right and asked the defendant whether he had understood. The defendant indicated in each instance that he had, and he then placed his initials on the form next to the right that had just been read to

---

[5] We note that the intelligence levels ascribed to the defendant by his own expert witnesses were not inconsistent with those found to permit a finding of a valid waiver in other cases. The psychologist testified that the defendant's "overall intellectual ability falls in the dull normal range." See, e.g., *State* v. *Boscarino,* 204 Conn. 714, 744, 529 A.2d 1260 (1987) (defendant with "low IQ" and poor ability to "formulate abstract concepts"; incriminating statement held admissible and waiver found valid); *State* v. *Toste,* 198 Conn. 573, 579, 504 A.2d 1036 (1986) (statement of defendant with IQ of 68–71, who was mildly retarded, schizophrenic, and of "dull normal" intelligence held admissible).

him. After translating all the rights on the rights form, including her translation that "he's been advised of all his rights and that he fully understands his rights, and that he's waiving his rights freely and voluntarily with no fear and no promises," the translator told the defendant that if he agreed with the document, he could sign it. The defendant then signed the rights form that had been read to him.

"The question [of valid waiver] is not one of form, but rather whether the defendant in fact knowingly and voluntarily waived the rights delineated in the *Miranda* case." *North Carolina* v. *Butler,* supra. The defendant contends that the Bridgeport police committed reversible error in obtaining his signature on a "Notice of Rights," rather than a "Waiver of Rights" form. We reject this argument as one that elevates form over substance. See *State* v. *Weidenhof,* 205 Conn. 262, 269, 533 A.2d 545 (1987). After having been advised of all the *Miranda* rights, including the right to remain silent, the right to an attorney, and the right not to be questioned without consent, the defendant was asked whether he would be willing to make a statement to police about the crimes with which he was being charged. He responded by narrating his version of the events in question. "Under these circumstances, the defendant's expressed willingness to speak constituted an explicit affirmative act evidencing waiver, which the court could reasonably find persuasive despite the defendant's [failure] to sign [a] waiver form." *State* v. *Harris,* 188 Conn. 574, 580, 452 A.2d 634 (1982), cert. denied, 460 U.S. 1089, 103 S. Ct. 1785, 76 L. Ed. 2d 354 (1983).

On the issue of the language used during the translation of the *Miranda* rights waiver, the defendant presented the expert testimony of the graduate student in Spanish who was a teaching associate. She testified that the translator erroneously had used the Spanish word for "exercising" ("ejerciendo") instead of the

word for "waiving" ("renunciando") in the translation. Her testimony, in essence, was that the defendant might reasonably have understood the translation as "I am *exercising* my rights" rather than "I am *waiving* my rights."

The expert graduate student's testimony regarding the translation was compromised in two significant respects. First, there was no recording, either on tape or by transcription, of the actual translation at the time the translator made it. The translator testified at the suppression hearing sixteen months *after* the event in question as to her recollection of what she *thought* she would have said. It was this recollection, then, rather than the actual translation, that formed the basis of the defense witness' criticism. Second, the psychologist testified that "ejerciendo" is a difficult Spanish word and that it was unlikely that the defendant would have understood its meaning. Thus, even if the translator's recollection had been accurate and the defense witness correctly described an error in the translation, the error might reasonably have been found to have had no impact, because the more sophisticated word was beyond the defendant's understanding. On the whole record, coupled with the fact that the defendant had a working understanding of English, as evidenced by his conversations with the police, we conclude that the trial court did not err in finding that the defendant was competent to waive his *Miranda* rights knowingly and intelligently. *State* v. *Boscarino,* supra.

The defendant also claims that his oral and written statements to police on May 6, 1983, the day of his arrest, along with a further oral statement given at the Bridgeport jail on June 30, 1983, should not have been admitted because they were made involuntarily. The factual context of the defendant's May 6, 1983 statements has been previously recited and requires no repe-

tition at this juncture. As to those statements, we are satisfied that they were the " 'product of an essentially free and unconstrained choice.' " *Schneckloth* v. *Bustamonte,* 412 U.S. 218, 225, 93 S. Ct. 2041, 36 L. Ed. 2d 854 (1973), quoting *Culombe* v. *Connecticut,* 367 U.S. 568, 602, 81 S. Ct. 1860, 6 L. Ed. 2d 1037 (1961). We find no evidence in the record that the statements in issue were involuntary or that their admission offends due process; see *Colorado* v. *Connelly,* supra, 166–67; *State* v. *DeForge,* 194 Conn. 392, 397–98, 480 A.2d 547 (1984); and we therefore hold that it was within the trial court's discretion to admit them.

The defendant further claims that the trial court should have suppressed as involuntary his statement to Detective Leo Krusinski at the Bridgeport jail. The record discloses that on June 30, 1983, the defendant telephoned the Bridgeport detective bureau, requesting to speak with Krusinski. In response, Krusinski went to the Bridgeport correctional center and met the defendant in a holding area. The detective asked the defendant why he wanted to speak to him. The defendant recounted to Krusinski his version of the shooting, i.e., that the "Cuban man" had killed the two victims and then had thrown the gun to the defendant. See footnote 4, supra. He then gave Krusinski the names of two men who he claimed had witnessed the shootings. Both Krusinski and the defendant spoke only in English at this meeting. Although Krusinski knew that the defendant had been arraigned and had retained a lawyer, he did not advise the defendant of his *Miranda* rights.

" 'The [traditional] test of voluntariness is whether an examination of all the circumstances shows that the conduct of police was such as to overbear the defendant's will to resist and bring about a confession, not

freely self-determined.' " *State* v. *Perry,* 195 Conn. 505, 516, 488 A.2d 1256 (1985), quoting *State* v. *DeForge,* supra.

The defendant concedes that there were no police threats or coercion and that, therefore, his federal constitutional claim of involuntariness is now foreclosed by the United States Supreme Court's decision in *Colorado* v. *Connelly,* supra, 163–64. In that case, the court required "police overreaching" as the "crucial element" in any inquiry into "constitutional 'voluntariness.' " Id.

The defendant requests, however, that this court review his challenge to the admissibility of the statements based solely upon factors other than police coercion. The defendant claims that, under the broader protections afforded him by article first, § 8, of the Connecticut constitution,[6] it was error for the trial court to admit these statements. The defendant contends that this article of the Connecticut constitution requires us to consider his limited intelligence and education, his brain damage, his inability to deal effectively with stress, and his continued incarceration, in determining whether these statements were voluntary.

This court has not had occasion to decide whether, in light of the recent United States Supreme Court decision in *Colorado* v. *Connelly,* supra, a claim of involuntariness in the absence of any allegations of police overreaching may be successfully pursued under our state constitution. Because "[w]e find no persuasive evidence of involuntariness on the present record"; *State* v. *Barrett,* supra, 452; we do not decide whether statements characterized as involuntary by reason of their being motivated by factors *other* than police coercion, are inadmissible under our state constitution.

[6] Article first, § 8, of the Connecticut constitution provides in part: "No person shall be compelled to give evidence against himself, nor be deprived of life, liberty or property without due process of law . . . ."

" 'On appeal, in order to determine whether the defendant's constitutional rights have been infringed, we review the record in its entirety . . . .' *State* v. *Toste,* [198 Conn. 573, 576, 504 A.2d 1036 (1986)]." *State* v. *Shifflett,* 199 Conn. 718, 729, 508 A.2d 748 (1986). Our examination of the facts in this record does not support the defendant's claim that his psychological characteristics deprived him of his ability to make a free and rational choice to speak with the police. See footnote 5, supra. Nor is, as the defendant asserts, his continued incarceration from the time of his arrest in and of itself enough to render his statement to Krusinski involuntary. See *Schneckloth* v. *Bustamonte,* supra, 226; *Chambers* v. *Florida,* 309 U.S. 227, 60 S. Ct. 472, 84 L. Ed. 716 (1940); *State* v. *Toste,* supra, 584. Further, the defendant, rather than the police, requested the June 30, 1983 contact. Although defense counsel, at the hearing on the motion to suppress, sought to characterize the meeting as an "interrogation," Krusinski maintained throughout his testimony that the conversation was merely an "interview." No matter how the meeting is characterized, if the defendant's responses to questions were made voluntarily, no error occurs in admitting the responses. See *State* v. *DeForge,* supra. Considering the totality of the circumstances, we believe that the trial court's ruling on voluntariness is supported by substantial evidence. *State* v. *Shifflett,* supra, 730.

II

The defendant next claims that the trial court erred in denying his motion to dismiss based on the loss or destruction of physical evidence and in refusing to instruct the jury on adverse inferences they would be permitted to draw if they found that the loss or destruction had been intentional.

The T-shirt worn by Jose "Willy" Rivera and the clothing removed from the victims were examined by the state toxicological laboratory. The laboratory tests revealed that the blood stains found on the T-shirt and the clothing had been made by type O human blood. Both victims had type O blood. The state laboratory returned the T-shirt and the victims' clothing to the Bridgeport police department on December 19, 1983. They were never seen again.

The defendant claimed at trial that the loss or destruction of this clothing, particularly the T-shirt, so impaired his right to a fair trial that it should serve as the basis for dismissal. To establish the prejudice caused to him by the unavailability of the T-shirt, he called a bloodstain pattern analyst to testify. The expert testified that with physical observation of the stains on the T-shirt he might have been able to determine the distance between Rivera and the victims. He testified further that he could possibly have determined whether the spots of blood were "back spatter," which may have tended to show that Rivera was not, as he claimed, an inactive participant. Throughout the trial, the defendant sought to show that the loss or destruction of the evidence was an intentional act on the part of the Bridgeport police motivated by the weakness of their case and the desire to destroy potentially exculpatory evidence.

" 'In considering whether testimony concerning lost or destroyed evidence should be admitted [or the underlying prosecution dismissed], the trial court has to look to numerous factors including [1] the reason for the unavailability of the evidence, [2] the materiality of the evidence, [3] the likelihood of mistaken interpretation of it by witnesses or the jury, and [4] the prejudice to the defendant caused by the unavailability of the evi-

dence.' *State* v. *Hamele,* 188 Conn. 372, 381, 449 A.2d 1020 (1982)." *State* v. *Boucino,* 199 Conn. 207, 229, 506 A.2d 125 (1986).

As to the first factor, the trial court found that while the police department was certainly negligent in failing to preserve the evidence, there was no evidence of deliberate and intentional destruction. Second, while the court found that the evidence, consisting of the bloodstained clothing of the victims and a witness, was of such a nature as to be material to the case, it was not so related to the commission of the murders as to warrant a dismissal. The third factor, the likelihood of mistaken interpretation, was minimized by the trial court's adverse inference instruction on the missing evidence.[7] See *State* v. *Hamele,* supra, 382 n.5. Moreover, the court allowed extensive testimony on this issue and the defendant was permitted to develop fully through his examination of the witnesses the negative implications to be imputed to the state's case by the absence of this evidence. Finally, the prejudice to the defendant was not substantial. The additional evidence that might have been obtained from further examining or testing of the T-shirt could only have served to inculpate Rivera, the eyewitness, who claimed to have observed the shootings from the doorway. Such evidence could have been significant had either the defendant or Marin, the surviving victim, claimed that Rivera was the assailant. The gravamen of the defendant's claim through-

[7] The charge to the jury included the following instruction regarding the missing evidence: "There was also testimony in evidence that the T-shirt, upon return from the State Toxicologist, was left on the detective's desk and never placed in the property room or evidence room for preservation for trial. And that this T-shirt is lost and is not available as evidence. There is a principle of law that where evidence is within the sole power of one party to present or when one party has supervision or sole access to such evidence and that evidence is not produced, the other party, in this case the defendant, is entitled to an inference that [that] evidence would have favored the defense and would have been unfavorable to the State."

out, however, was not that Rivera had committed the murders but that the "Cuban man" was the killer. Marin, on the other hand, implicated the defendant. Since neither eyewitness claimed that Rivera was the assailant, the patterns of the stains on his T-shirt did not have substantial materiality.

On the record before us, then, we agree with the trial court that granting the defendant's motion for dismissal under these circumstances would have been too harsh a sanction, and that the defendant's right to a fair trial was protected by allowing full development and presentation of the missing evidence issue at trial and by the court's adverse inference instruction to the jury.

The defendant also claims error in the trial court's failure to charge, as requested, on adverse inferences the jury would be permitted to draw if they found that the loss or destruction of the evidence had been intentional. The defendant sought an instruction to the effect that the destruction had been deliberate, as the evidence tended to weaken the state's case. The court found, however, that there was no factual basis for a conclusion that the loss or destruction had been intentional or deliberate. It was within the trial court's discretion, therefore, to modify the adverse inference instruction requested. See footnote 7, supra. *State* v. *Vennard,* 159 Conn. 385, 399, 270 A.2d 837 (1970), cert. denied, 400 U.S. 1011, 91 S. Ct. 576, 27 L. Ed. 2d 625 (1971).

### III

The defendant's final claim is that the trial court violated his state and federal constitutional rights of due process when it charged the jury concerning circumstantial evidence. The trial court instructed that an inference must be not only logical and reasonable, but strong enough so that the jury could find "it is *more*

*probable than not* that the fact inferred is true.''[8] (Emphasis added.) We have examined similar language concerning the drawing of inferences on numerous recent occasions and have found such language to be erroneous because it has a high probability of misleading the jury on the important issue of the burden of proof imposed on the state. *State* v. *McDonough,* 205 Conn. 352, 533 A.2d 857 (1987); *State* v. *Whelan,* 200 Conn. 743, 513 A.2d 86, cert. denied, 479 U.S. 994, 107 S. Ct. 597, 93 L. Ed. 2d 598 (1986); *State* v. *Rogers,* 198 Conn. 53, 502 A.2d 360 (1985); *State* v. *Reddick,* 197 Conn. 115, 496 A.2d 466 (1985), cert. denied, 474 U.S. 1067, 106 S. Ct. 822, 88 L. Ed. 2d 795 (1986). The ultimate issue that we must resolve upon review is whether the instruction has made it "reasonably possible that the jury was misled by the alleged errors in the court's instructions." *State* v. *Reddick,* supra, 132. "The trial court's instructions [therefore] must be read with reference to the factual issues in the case." *State* v. *Miller,* 202 Conn. 463, 491, 522 A.2d 249 (1987).

The central factual issues in this case were the identity of the assailant and the circumstances surrounding this bizarre crime. Two eyewitnesses testified that the defendant was the lone attacker. The defendant claimed that a third person, the "Cuban man," had killed two of the victims and had thereafter thrown the gun to him, Gonzalez, who then had shot Marin inadvertently. The ultimate factual issue, therefore, was the credibility of the conflicting testimony of the three witnesses.

---

[8] In the charge complained of, the trial court instructed the jury: "You may apply the rule of circumstantial evidence. This rule involves the offering of evidence from facts from which you are asked to infer the existence of another fact or set of facts. Such an inference may be made provided two elements in the application of the rule are satisfied. First, the fact from which you are to draw the inference has itself been proven beyond a reasonable doubt. Secondly, the inference has [sic] to be drawn is not only logical and reasonable, but is strong enough so that you can find that it is more probable than not that the fact inferred is true."

"A significant factor for the jury's consideration was the credibility to be accorded to the [other eyewitnesses as opposed] to the defendant. The principal factual issues, therefore, were not classically dependent upon circumstantial evidence for their proof . . . ." *State* v. *McDonough,* supra, 358–59.

"We have recognized that an erroneous charge is not always harmful. *State* v. *Miller,* supra, 489–92. An isolated error in an instruction may be cured by other portions of the charge, or circumstantial evidence may be so insignificant compared to direct evidence that it is clear beyond a reasonable doubt that the erroneous instruction did not affect a jury's determination of guilt or innocence. Id." *State* v. *McDonough,* supra, 356. Our task is not to evaluate the challenged portion of the instructions in "isolation from the overall charge," nor to conduct "a microscopic search for possible error," but to review the charge as a whole. *State* v. *Reddick,* supra; see also *State* v. *McDonough,* supra.

Reviewing the instructions as a whole within the context of the factual posture of this case, we find that it was not reasonably possible that the jury was misled concerning the state's burden of proof. See *State* v. *McDonough,* supra, 356–62; *State* v. *Miller,* supra, 490–91; *State* v. *Farrar,* 7 Conn. App. 149, 155, 508 A.2d 49, cert. denied, 200 Conn. 805, 512 A.2d 229ʼ (1986). The trial court reiterated no less than sixty-eight times the state's burden of proving every element of each crime charged beyond a reasonable doubt. The contested portion of the charge occurred but once.

There is no error.

In this opinion the other justices concurred.