STATE OF CONNECTICUT *v.* RICHARD L. CLARK
(8750)

DUPONT, C. J., SPALLONE and O'CONNELL, JS.

Argued December 10, 1990—decision released February 12, 1991

*Lauren Weisfeld,* assistant public defender, with whom, on the brief, was *G. Douglas Nash,* public defender, for the appellant (defendant).

*Leon F. Dalbec, Jr.,* deputy assistant state's attorney, with whom, on the brief, were *Michael Dearington,* state's attorney, and *Patrick J. Clifford,* senior assistant state's attorney, for the appellee (state).

SPALLONE, J. The defendant, Richard Clark, was charged with the crime of murder in violation of General Statutes § 53a-54a. Prior to trial, the defendant filed a motion to suppress certain inculpatory statements that he had made to two police officers. After a hearing, the trial court, *Purtill, J.,* denied the defendant's motion. The state then filed a substitute infor-

mation charging the defendant with one count of manslaughter in the first degree in violation of General Statutes § 53a-55 (a) (1).[1] The defendant pleaded nolo contendere to the substitute information, reserving the right to appeal the denial of his motion to suppress. The defendant was thereafter sentenced to a term of sixteen years imprisonment. The defendant brings this appeal, pursuant to General Statutes § 54-94a and Practice Book § 4003, challenging the decision of the trial court denying his motion to suppress the inculpatory statements. Specifically, the defendant claims that the trial court improperly found that the defendant's waiver of his *Miranda*[2] rights was made voluntarily, knowingly and intelligently. We affirm the decision of the trial court.

At the hearing on the motion to suppress, the trial court was presented with the following evidence. On May 2, 1988, officers of the New Haven police department responded to reports of a shooting at Sylvan Avenue in New Haven. Upon their arrival, they found that the victim, Owen Keefe, had been shot in his chest. The victim died a short time later.

Police investigation of the incident implicated the defendant in the shooting. On May 4, 1988, Detective

---

[1] "[General Statutes] Sec. 53a-55. MANSLAUGHTER IN THE FIRST DEGREE: CLASS B FELONY. (a) A person is guilty of manslaughter in the first degree when: (1) With intent to cause serious physical injury to another person, he causes the death of such person or of a third person; or (2) with intent to cause the death of another person, he causes the death of such person or of a third person under circumstances which do not constitute murder because he committed the proscribed act or acts under the influence of extreme emotional disturbance, as provided in subsection (a) of section 53a-54a, except that the fact that homicide was committed under the influence of extreme emotional disturbance constitutes a mitigating circumstance reducing murder to manslaughter in the first degree and need not be proved in any prosecution initiated under this subsection; or (3) under circumstances evincing an extreme indifference to human life, he recklessly engages in conduct which creates a grave risk of death to another person, and thereby causes the death of another person. . . ."

[2] *Miranda* v. *Arizona*, 384 U.S. 436, 86 S. Ct. 602, 16 L. Ed. 2d 694 (1966).

Joseph Green and Officer Leroy Deasc visited the defendant's home to interview him. The defendant, who was sixteen years old at the time, and his older brother were outside of their home when the detectives arrived. Green and Deasc, who were in an unmarked vehicle and in plain clothes, identified themselves as police officers and the defendant identified himself as Richard Clark. The defendant then told the officers that, prior to their arrival, he was preparing to turn himself in because he had heard that the police wanted to talk to him. The officers asked the defendant whether he would be willing to go to the police station with them. He agreed to do so. The officers then asked the defendant's brother if he wanted to accompany the defendant to the police station. He did not want to do so. The defendant was not handcuffed at any time nor did the officers display their weapons at any time. No words were exchanged during the ten minute ride to the police station.

At the police station, the defendant accompanied the detectives to an interview room. Before any questions were asked, Deasc read the *Miranda* rights to the defendant. The defendant was then handed a form containing those rights and asked to read it. After the defendant had read the *Miranda* rights, he proceeded to initial each particular warning. The waiver portion of the document was then read to the defendant and he read this portion of the document himself. The defendant asked no questions while reading the document, at no time asked for an attorney, and did not indicate to the officers that he wanted to remain silent. The defendant appeared to understand the questions asked concerning the *Miranda* rights, was articulate in his conversation, and did not appear to the officers to be under the influence of alcohol or drugs. The defendant signed the waiver form, agreeing to answer questions and to make a statement. The officers did

not ask the defendant if he wanted a parent present during questioning nor did the defendant ask for one to be present.

After the *Miranda* waiver was executed, the officers began taking a formal statement from the defendant. A short time later, the officers brought in a tape recorder and placed it on the table in full view of the defendant. At the beginning of the recorded statement, the officers once again advised the defendant of his *Miranda* rights. The defendant then proceeded to give a statement to the officers. In his statement, the defendant admitted that he had shot the victim. Upon completion of the defendant's statement, the officers sent the recorded statement to be transcribed. While the tape recording was being transcribed, the officers brought the defendant some food. The defendant was advised that he was going to be arrested for murder before the transcript of the recording was presented to him. The officers then followed the same procedure employed earlier in again advising the defendant of his *Miranda* rights. Deasc read those rights to the defendant, the defendant read them himself, the defendant initialed each particular warning, Deasc read the waiver portion of the document to the defendant, the defendant read the waiver portion of the form himself and then signed the waiver. After the execution of this second waiver form, the defendant read and signed his transcribed statement.

The defendant's mother, Cora Clark, testified at the suppression hearing that she was at work when her daughter called and told her that the defendant had been arrested. Mrs. Clark testified that she called the police station, was told that her son was there, and told the officer on the phone that she would come right down to the station. According to Mrs. Clark, when she arrived at the police station she did not identify herself as the defendant's mother, nor did she state that

the defendant was not to be questioned. She was told that the defendant had been arrested for murder and that she could not see him. Mrs. Clark then went home. She did not attempt to contact an attorney for her son.

The defendant also testified at the suppression hearing. According to the defendant, he agreed to talk to the police officers because he believed that they were going to let him go after he was questioned. He also testified that he had asked the officers to call his home and ask for his mother, but that the officers ignored this request. The defendant further testified that he was a junior in high school, was an average student and had no trouble reading.

On appeal, the defendant claims that any waivers of his *Miranda* rights were invalid because he did not voluntarily, knowingly and intelligently waive those rights. He also claims that the statements he gave the police were involuntary. We disagree.

"To be valid, a waiver must be voluntary, knowing and intelligent. *Miranda* v. *Arizona,* 384 U.S. 436, 475, 478, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966); *State* v. *Gonzalez,* 206 Conn. 213, 217, 537 A.2d 460 (1988); *State* v. *Boscarino,* 204 Conn. 714, 743, 529 A.2d 1260 (1987). The state has the burden of proving by a preponderance of the evidence that the defendant voluntarily, knowingly and intelligently waived his *Miranda* rights. *State* v. *Hernandez,* 204 Conn. 377, 395, 528 A.2d 794 (1987); *State* v. *Chung,* 202 Conn. 39, 48, 519 A.2d 1175 (1987); *State* v. *Smith,* 200 Conn. 465, 481, 512 A.2d 189 (1986). Whether a purported waiver satisfies those requirements is a question of fact that depends on the circumstances of the particular case. *North Carolina* v. *Butler,* 441 U.S. 369, 374–75, 99 S. Ct. 1755, 60 L. Ed. 2d 286 (1979); *Johnson* v. *Zerbst,* 304 U.S. 458, 464, 58 S. Ct. 1019, 82 L. Ed. 2d 1461 (1938); *State* v. *Boscarino,* supra; *State* v. *Chung,*

supra." *State* v. *Northrop*, 213 Conn. 405, 417, 568 A.2d 439 (1990). "Although the issue is therefore ultimately factual, our usual deference to the fact-finding by the trial court is qualified, on questions of this nature, by the necessity for a scrupulous examination of the record to ascertain whether such a factual finding is supported by substantial evidence." *State* v. *Harris*, 188 Conn. 574, 579–80, 452 A.2d 634 (1982); *State* v. *Hernandez*, 204 Conn. 377, 395–396, 528 A.2d 794 (1987).

After a careful review of the record, we conclude that the state has met its burden of proof. The defendant was read his *Miranda* rights, read those rights himself, initialed each of them, told the detective that he understood those rights, signed the waiver form, had no difficulty reading, was articulate, and was not under the influence of alcohol or drugs. Accordingly, there was ample evidence to support the trial court's ruling that the state had sustained its burden of proving by a preponderance of the evidence that the defendant voluntarily, intelligently and knowingly waived his *Miranda* rights.

The defendant's next claim is that his statement was not given voluntarily. He points to two factors that he claims impinged on the voluntariness of his incriminatory statement. The first factor is the defendant's claim that he and his mother were not allowed to see each other at the police station and the second is that the defendant's claim that he relied on alleged promises by the police that he could go home after making a statement. We agree with the trial court that under all of the circumstances the state met its burden of proving voluntariness.

"Irrespective of *Miranda*, and the fifth amendment itself, due process of law prohibits the state from using an involuntary confession at trial. *Brown* v. *Allen*, 344 U.S. 443, 475, 73 S. Ct. 397, 97 L. Ed. 469 (1953); *State*

v. *Shifflett,* [199 Conn. 718, 727, 508 A.2d 748 (1986)]."
*State* v. *Barrett,* 205 Conn. 437, 451, 534 A.2d 219
(1987). "The state must also prove the voluntariness
of the defendant's statements by a preponderance of
the evidence. *Lego* v. *Twomey,* 404 U.S. 477, 489, 92
S. Ct. 619, 30 L. Ed. 2d 618 (1972); *State* v. *Barrett,*
[supra]; *State* v. *Chung,* [202 Conn. 39, 53, 519 A.2d
1175 (1987)]." *State* v. *Northrop,* supra, 419. " ' "The
[traditional] test of voluntariness is whether an exami-
nation of all of the circumstances shows that the con-
duct of police was such as to overbear the defendant's
will to resist and bring about a confession, not freely
self-determined." ' " *State* v. *Gonzalez,* 206 Conn. 213,
221–22, 537 A.2d 460 (1988). The voluntariness of a
confession must be determined by the trial court as a
preliminary question of fact. *Sims* v. *Georgia,* 385 U.S.
538, 87 S. Ct. 639, 17 L. Ed. 2d 593 (1967); *State* v.
*Shifflett,* 199 Conn. 718, 727, 508 A.2d 748 (1986). On
review, this court undertakes a scrupulous examina-
tion of the record to ascertain whether the trial court's
factual finding is supported by substantial evidence.
*State* v. *Madera,* 210 Conn. 22, 48–49, 554 A.2d 263
(1989); *State* v. *Gonzalez,* supra, 223; *State* v. *Shifflett,*
supra, 730.

The defendant's assertion that his confession was
involuntary because he was not allowed to see his
mother before making his statement is without merit.
The defendant's testimony that he had asked the police
to call his mother upon his arrival at the police station
was refuted by the testimony of the two detectives. The
defendant's mother testified that when she arrived at
the police station she never identified herself and there
was no indication that any officer connected the defend-
ant's mother's phone call with the subsequent appear-
ance of a woman at the station. Similarly, there was
no indication that the officers who interviewed the
defendant knew that the defendant's mother had tried

to see him. Furthermore, even if the defendant's testimony had been credited, the denial of a request to see one's mother will not, in and of itself, render a statement involuntary. *State* v. *Whitaker,* 215 Conn. 739, 749, 578 A.2d 1031 (1990).

The second ground on which the defendant rests his claim that his confession was not voluntary is also without merit. During the suppression hearing, the defendant testified that when he got into the detective's vehicle on the way to the police station the officers told him that they just wanted to ask him a few questions and then they would let him go. The defendant claims that this alleged comment constituted a promise intentionally and effectively suborning his incriminatory statements and causing his confession. See *State* v. *Perry,* 195 Conn. 505, 518, 488 A.2d 1256 (1985). We disagree.

The defendant's testimony was refuted by the testimony of the two officers who stated that no conversation took place in the vehicle. The trial court could quite properly have found the officers' testimony more credible. *State* v. *McCarthy,* 197 Conn. 247, 258, 496 A.2d 513 (1985). Moreover, even if the defendant's testimony were credited, such a statement would not constitute a promise of leniency. When the defendant accompanied the police officers to the station house, he was not under arrest. The defendant told the officers that he was planning to tell the police what had happened and that he intended to turn himself in. As Deasc testified, the defendant was free to leave the station at any time until he confessed to shooting the victim. Until that point in time, the officers could have reasonably expected that the defendant would have continued to have been free to leave after answering a few questions. Certainly, we do not find that such a statement made under these circumstances would constitute such coercive police activity that it would render the defend-

ant's confession not "voluntary" within the meaning of the due process clause of the fourteenth amendment.

The judgment is affirmed.

In this opinion the other judges concurred.