## STATE OF CONNECTICUT *v.* ROGER B. SHERWOOD
### (8203)

DALY, NORCOTT and HEIMAN, Js.

Argued June 26—decision released September 17, 1991

*Susan M. Hankins,* assistant public defender, with whom, on the brief, was *G. Douglas Nash,* public defender, for the appellant (defendant).

*Richard F. Jacobson,* assistant state's attorney, with whom, on the brief, were *Donald A. Browne,* state's attorney, and *Robert A. Lacobelle,* senior assistant state's attorney, for the appellee (state).

HEIMAN, J. The defendant appeals from a judgment of conviction, rendered after a trial to the court, of sexual assault in the first degree with a deadly weapon in violation of General Statutes § 53a-70a (a), sexual assault in the third degree in violation of General Statutes § 53a-72a (a) (1) (B), unlawful restraint in the first degree in violation of General Statutes § 53a-95 (a), and attempted sexual assault in the first degree in violation of General Statutes §§ 53a-70 (a) and 53a-49. He claims that the trial court (1) improperly denied his motion to suppress identification testimony and (2) incorrectly admitted into evidence testimony concerning lost or destroyed evidence, denying his right to due process and a fair trial. We affirm the judgment of the trial court.

The trial court could reasonably have found the following facts. On July 25, 1986, at about 3 a.m., the two victims, a twenty-three year old female and a nineteen year old male, were at St. Margaret's Shrine in Bridgeport. The female victim observed a person walking across a parking area about thirty feet away. She suggested to the male victim that they leave the area, and they entered the male's vehicle to do so. The vehicle would not start. The female victim observed the person approaching the car. She attempted to close the electric window, but was unable to do so because the car had stalled. As the person came closer to the car, the female victim saw that he was a man wearing a nylon stocking over his face and carrying a gun. The man approached the car, stood next to the passenger door and put a gun to the female victim's head. The man said that if the male victim started the vehicle he

would "blow [the female victim's] brains out." The male victim was ordered to place his hands on the dashboard of the car. The female victim was ordered to place her pocketbook on the floor and open the door of the vehicle. When she complied, her assailant placed a knife to her throat. He forced her to pull down her shorts and when she had done so he placed the handle of the knife in her vaginal area. He also pulled up her shirt and fondled her breasts. He then ordered her to perform fellatio upon him. Fearful that he would use the gun or knife, she complied.

The assailant ordered the female victim to get out of the car. She did so, and the assailant then ordered her to walk around the back of the vehicle to the driver's side of the car, placed the gun to the head of the male victim, pointed the knife at the throat of the female victim and ordered the male victim to perform fellatio. The assailant turned away from the male victim who was then able to start the car and drive away. He went to a police station, reported the incident and described the perpetrator. The assailant left the female victim at the shrine and walked away. The female victim sought assistance at a house in the area and telephoned the police.

The female victim estimated that between ten and twenty-five minutes elapsed between the time that she first observed the perpetrator and the time that she was finally able to leave the shrine. She described her assailant as a male, wearing blue sweat pants and a shirt, with a nylon stocking over his face. She further stated that he was white or Hispanic, about five feet eight inches tall, of average build with a slightly hunched over posture. She described the knife as a folding type with a six or seven inch blade and a small amount of red on it. She also stated that the parking lot had dim lighting all around it.

The male victim described the assailant to the police as a white male, about six feet tall, of medium build, with light hair, and wearing blue sweat pants and a nylon stocking over his head. He also told the police that the perpetrator had displayed a gun and a knife. He stated that the lighting in the area was dim and that the interior light in the car was on. The perpetrator was close enough for the male victim to observe his appearance. He estimated that he was at the shrine with the assailant for between five and ten minutes.

When the female victim called for assistance, the police dispatched officers to the shrine. During the telephone call, the female victim described her assailant as a white male, approximately six feet tall, carrying a .357 magnum and wearing jogging pants and a white or light colored shirt.

Police officers were dispatched to Bridgeport Hospital in response to information from hospital personnel indicating that a man had made several telephone calls to the hospital seeking help, stating that he had done "something bad" in the area of St. Margaret's Shrine. As a result of cooperation between the telephone repair service, hospital personnel and the police, one of these calls was traced to the residence of Robert W. Sherwood, the defendant's father. Police officers were dispatched to the location from which the intercepted call was made. The defendant was found there and taken to the police station.

While the male victim was giving a statement to a police officer, another officer entered the room and said that they might have the suspect in custody. The male victim was taken to another room in the police station and asked to wait outside the door. He was also asked to give the police some phrase that had been used by the perpetrator during the confrontation. Attempts to have the suspect repeat the phrase were unsuccessful.

The door into the room in which the suspect was being held was open. At the request of a police officer, the male victim looked into the room where he saw the defendant. The male victim then identified him as the perpetrator. He also observed several other persons in the room dressed in suits who he assumed were police officers. He advised the officer with him that the defendant was dressed differently than he had been at the shrine but that he was absolutely positive that the person whom he observed in the room at the police station was the perpetrator. At trial, he identified the defendant in the courtroom as the perpetrator.

## I

The defendant first challenges the trial court's denial of his motion to suppress the male victim's identification of him. He asserts that the trial court incorrectly concluded that although the original out-of-court identification procedure was impermissively suggestive, under the totality of the circumstances the in-court identification was reliable and uncorrupted by the suggestive pretrial procedure. We disagree.

The state at trial and again on written and oral argument in this court has conceded that the procedure employed at the police station was impermissively suggestive. Thus, the trial court had to determine only whether the identification was nonetheless reliable, reliability being the keystone in determining the admissibility of identification evidence. *State* v. *Vilhotti,* 11 Conn. App. 709, 716, 529 A.2d 235 (1987). In order to determine reliability, the trial court is required to determine whether, under the totality of the circumstances, the identification is rendered unreliable because of the corrupting influence of the suggestive procedure previously employed. *Manson* v. *Brathwaite,* 432 U.S. 98, 114, 97 S. Ct. 2243, 53 L. Ed. 2d 140 (1977).

In determining the reliability of an identification, the factors to be considered " 'include the opportunity of the witness to view the criminal at the time of the crime, the witness' degree of attention, the accuracy of his prior description of the criminal, the level of certainty demonstrated at the confrontation, and the time between the crime and the confrontation. Against these factors is to be weighed the corrupting effect of the suggestive identification itself.' " *State* v. *Piskorski,* 177 Conn. 677, 742, 419 A.2d 866, cert. denied, 444 U.S. 935, 100 S. Ct. 283, 62 L. Ed. 2d 194 (1979), citing *Manson* v. *Brathwaite,* supra.

Once the trial court found that the police had employed an identification procedure that was impermissively suggestive, the burden was cast on the state to establish by clear and convincing evidence that the subsequent identification was based on the victim's independent recollection. *State* v. *Mitchell,* 204 Conn. 187, 204, 527 A.2d 1168, cert. denied, 484 U.S. 927, 108 S. Ct. 923, 98 L. Ed. 2d 252 (1987). "The reliability inquiry delineated in *Manson* is fact-bound and made on an ad hoc basis." Id., 203.

The trial court carefully reviewed the identification evidence and applied the requisite factors to determine its reliability. Nothing in the record demonstrates that the trial court exceeded its prerogative in finding that the identification made by the male victim was, under the totality of the circumstances, reliable; *State* v. *Piskorski,* supra, 745; and that the procedure employed did not give rise to a substantial likelihood of irreparable misidentification such as to mandate the exclusion of the subsequent identification. *State* v. *Smith,* 165 Conn. 680, 684–85, 345 A.2d 41 (1974).

Our review of the entire record clearly establishes that the identification evidence was reliable and that

the trial court acted properly in denying the defendant's motion to suppress the identification.

## II

The defendant next asserts that the trial court improperly admitted testimony concerning certain tangible objects that had been seized from the defendant by the police, and were subsequently lost or destroyed by the police. The defendant claims that this action on the part of the trial court denied him due process and a fair trial. We disagree.

The consideration of certain additional facts is necessary for the resolution of this issue. On July 25, 1986, a search warrant was issued permitting the police to search the defendant's residence for certain items. Pursuant to the search warrant, the Bridgeport police executed the warrant and recovered from those premises certain items that were taken into possession by the police.[1] All of the items recovered were lost or misplaced by the Bridgeport police prior to trial. At trial, the defendant objected to the state's attempt to have the officer who had seized certain items under the warrant describe those items. Over the objection of the defendant, Officer Leonard Samatulski of the Bridgeport police department was permitted to testify as to items seized from the defendant's house and was then permitted to describe in detail the appearance of a buck knife that had been recovered from a dresser drawer in the defendant's bedroom and the appearance of a pistol grip that had been recovered from the same drawer. The buck knife was described as having a wood

[1] The police took into possession the following items: One 45 cal. bullet Rem-UNC; one plastic wood grain gun grip with the markings 357; one nine and one-half inch explorer buck knife with a four inch blade in a leather case; one box of Crossman .177 pellets; blue shorts with a possible blood stain; blue trunks with a possible blood stain; and a white sock with a possible blood stain.

grain handle with two brass ends having a gold color. The knife was further described as being approximately four inches long when closed and about nine inches long when opened. The pistol grip was described as being marked with the number 357 and the name Crossman. The bases of the defendant's objection to the description of the seized but missing evidence were that it impinged on his rights of confrontation and cross-examination and was irrelevant.

We first point out that the defendant does not claim that the lost evidence was either exculpatory or potentially exculpatory. Thus, he is not entitled to claim the applicability of the rule of *Brady* v. *Maryland,* 373 U.S. 87, 83 S. Ct. 1194, 10 L. Ed. 2d 215 (1963) (prosecutorial suppression of exculpatory evidence), or the rule of *Arizona* v. *Youngblood,* 448 U.S. 51, 109 S. Ct. 333, 102 L. Ed. 2d 281 (1988) (failure to preserve potentially exculpatory evidence). See *State* v. *Leroux,* 18 Conn. App. 223, 227, 557 A.2d 1271 (1989).

" 'Evidence is admissible when it tends to establish a fact in issue or to corroborate other direct evidence in the case. One fact is relevant to another fact whenever, according to the common course of events, the existence of the one, taken alone or in connection with other facts, renders the existence of the other either certain or more probable. Unless excluded by some rule or principle of law, any fact may be proved which logically tends to aid the trier in the determination of the issue." *State* v. *Sharpe,* 195 Conn. 651, 659, 491 A.2d 345 (1985). The main issue at trial was the identification of the defendant as the perpetrator. The defendant had been identified by one of the victims as the perpetrator of the crime, and the implements used in the commission of the crime, including the knife and pistol grip, had already been adequately described by both victims. Thus, in the context of the other evidence produced at trial, we conclude that these facts tended

to establish identity and to corroborate other direct evidence in the case. Therefore, such evidence was clearly relevant.

The defendant posits, however, that even if the testimony was relevant, the destruction or loss of the evidence was prejudicial to his defense. " ' "In considering whether testimony concerning lost or destroyed evidence should be admitted [or the underlying prosecution dismissed], the trial court has to look to numerous factors including [1] the reason for the unavailability of the evidence, [2] the materiality of the evidence, [3] the likelihood of mistaken interpretation of it by witnesses or the [trier of fact], and [4] the prejudice to the defendant caused by the unavailability of the evidence.' . . ." (Citation omitted.) *State* v. *Gonzalez,* 206 Conn. 213, 224–25, 537 A.2d 460 (1988). As our Supreme Court has previously noted, " '[t]he requirements of due process are met in the trial of a person accused of crime if he has been given the benefit of a fair and impartial trial in accordance with the settled course of judicial proceedings in this state.' " *State* v. *Asherman,* 193 Conn. 695, 724, 478 A.2d 227 (1984), cert. denied, 470 U.S. 1050, 105 S. Ct. 1749, 84 L. Ed. 2d 814 (1985).

The trial court carefully weighed all of the above factors in determining that the evidence before it was admissible. We cannot say that the trial court acted improperly in admitting the testimony about the lost or destroyed evidence. The officer who recovered the property had personal knowledge as to its character and appearance. He, as well as the victims who had described the implements employed, were subject to a full cross-examination by defense counsel. The evidence was not destroyed intentionally to deprive the defendant of its use at trial, nor was such a claim advanced. In addition, the defendant did not suffer prejudice as a result of its unavailability. *State* v. *Boucino,*

199 Conn. 207, 229, 506 A.2d 125 (1986). The trial court acted properly in admitting the contested testimony. See *State* v. *McIver*, 201 Conn. 559, 565, 518 A.2d 1368 (1986).

The judgment is affirmed.

In this opinion the other judges concurred.