STATE OF CONNECTICUT *v.* SCOTT A. NORTHROP
(13513)

PETERS, C. J., SHEA, CALLAHAN, COVELLO and HULL, Js.

Argued November 3, 1989—decision released January 9, 1990

*Antonio B. Braz,* with whom was *Scott P. Moser,* for the appellant (defendant).

*Carolyn K. Longstreth,* assistant state's attorney, with whom were *Patrick Clifford,* assistant state's attorney, and, on the brief, *Michael Dearington,* state's attorney, for the appellee (state).

CALLAHAN, J. The defendant, Scott Northrop, was charged with the crime of murder in violation of General Statutes § 53a-54a.[1] He was tried to a jury and con-

---

[1] "[General Statutes] Sec. 53a-54a. MURDER DEFINED. AFFIRMATIVE DEFENSES. EVIDENCE OF MENTAL CONDITION. CLASSIFICATION. (a) A person is guilty of murder when, with intent to cause the death of another

victed. The trial court subsequently sentenced him to a term of imprisonment of forty-five years. The defendant does not contest the sufficiency of the evidence to sustain his conviction. He claims, rather, that the trial court erred in failing to suppress statements he made to the New Haven police and in failing to suppress tangible evidence derived therefrom. He also claims that the trial court erred in denying his motion for a new trial because of the impropriety of the state's closing argument.

The record reveals that the charge against the defendant arose out of the murder of Edward DuPaul, a thirty-four year old New Haven fireman, who was shot to death at approximately 11:15 p.m. on May 18, 1987, as he sat in his automobile talking to Mary Ann Shusta, while parked on a dirt road in a marshy area of New Haven near the New Haven-East Haven border. While the victim and Shusta were conversing, a person wearing dark clothing approached the driver's side of DuPaul's car and fired three shots from a .38 caliber revolver into the victim's head and body through the driver's side window. DuPaul died the following afternoon in a New Haven hospital.

person, he causes the death of such person or of a third person or causes a suicide by force, duress or deception; except that in any prosecution under this subsection, it shall be an affirmative defense that the defendant committed the proscribed act or acts under the influence of extreme emotional disturbance for which there was a reasonable explanation or excuse, the reasonableness of which is to be determined from the viewpoint of a person in the defendant's situation under the circumstances as the defendant believed them to be, provided nothing contained in this subsection shall constitute a defense to a prosecution for, or preclude a conviction of, manslaughter in the first degree or any other crime.

"(b) Evidence that the defendant suffered from a mental disease, mental defect or other mental abnormality is admissible, in a prosecution under subsection (a), on the question of whether the defendant acted with intent to cause the death of another person.

"(c) Murder is punishable as a class A felony in accordance with subdivision (2) of section 53a-35a unless it is a capital felony."

On May 19, 1987, in the course of their investigation of the incident, New Haven detectives learned that the defendant had been seen the previous night, with a pistol in his possession, at a convenience store near the site of the shooting. Consequently, that evening, Detective James Ponteau, with two East Haven police officers, went to the defendant's residence at 29 Stoddard Road in East Haven to talk to him. The house at 29 Stoddard Road, where the defendant lived with his grandmother and aunt, is near the dirt road where the shooting occurred.

At the house Ponteau informed the defendant that the police wished to talk to him because they were investigating a shooting that had taken place the previous night in New Haven and that they had a report that he had been seen with a gun prior to the shooting, at a store in the area. The defendant told the detective that he had indeed been at the store but he denied having a gun or having anything to do with the shooting.

After this brief exchange, at Ponteau's request, the defendant agreed to go with the detective to New Haven police headquarters to give a statement. The defendant's aunt, Georgeann Pecoraro, asked to accompany her nephew, and Ponteau agreed. Thereafter, the three drove to New Haven in Ponteau's unmarked police car, the defendant in the front passenger seat and his aunt in the rear. The defendant was not handcuffed or otherwise restrained during the trip.

At police headquarters the defendant was taken to an interview room while his aunt, despite her expressed desire to remain with the defendant, was directed to sit in another area of the detective bureau.[2] Ponteau and the defendant were joined in the interview room at approximately 7 p.m. by Detective Mel Cartocetti.

---

[2] There is nothing in the record, however, to indicate whether the defendant wished his aunt to continue to accompany him.

Cartocetti introduced himself to the defendant and informed him that he was not under arrest and that he could leave police headquarters whenever he wished to do so. Cartocetti, thereafter, read the defendant his *Miranda* rights[3] and then explained them to him sentence by sentence. The defendant stated that he understood his rights and that he was willing to give a statement. He then signed a printed waiver of rights form.

Cartocetti and Ponteau thereafter conversed with the defendant for approximately thirty-five or forty minutes about his activities on May 18. Subsequently, a tape recorder was activated and Cartocetti again read the defendant his *Miranda* rights. He then interviewed the defendant on tape concerning the events of the previous night. During the recorded interview the defendant reiterated that he had been at the convenience store on the night of May 18 but denied having a gun or having anything to do with the shooting. He also acknowledged during the taped interview that he had come to the police station voluntarily to try to assist the police, that he understood all the questions, that he had been treated fairly, that he knew he was not under arrest, that he was not kept against his will, and that he had been told he could stop and walk out of headquarters at any time. Further, he refused to undergo a polygraph examination or consent to a search of his residence. At the conclusion of the interview at approximately 9:15 p.m., Cartocetti drove the defendant and his aunt to their house in East Haven.

After driving the defendant and his aunt home, Cartocetti parked 75 to 100 feet away and remained in his car. In approximately fifteen minutes, he received a radio call informing him that a search warrant had been

---

[3] *Miranda* v. *Arizona,* 384 U.S. 436, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966).

issued for the residence of the defendant at 29 Stoddard Road. At that point he left his car, approached a side door of the house and informed the defendant's grandmother and aunt, who were inside, that a warrant had been procured to search their home and that it would be executed shortly. Although invited in, he chose to remain on the porch and await the arrival of other officers. Other detectives and uniformed officers were on the scene shortly. When the search warrant arrived at about 10 p.m., a copy was given to the defendant's grandmother and a search was commenced.

Shortly after the search was under way, Detective Sergeant Michael Sweeney arrived at the premises and asked the defendant if he would walk outside and speak with him. The defendant agreed to do so and he and Sweeney walked down the driveway towards Sweeney's unmarked car. During this time Sweeney did not search the defendant or restrain him in any manner, and he did, once again, advise him of his *Miranda* rights. When the two arrived at Sweeney's car the defendant agreed to speak with Sweeney but declined his invitation to sit in the automobile.

Standing next to the car, Sweeney asked the defendant if he had shot the victim. The defendant denied doing so but displayed no reluctance to discuss the incident. After a short period the defendant left Sweeney and unaccompanied went back into the house to obtain a jacket. When he returned he continued the conversation with Sweeney and soon thereafter admitted that he had shot DuPaul.

After the defendant's admission, Sweeney requested that the defendant return with him to New Haven police headquarters to give a statement. The defendant refused to do so, stating that he was afraid and wished to stay at home. He did, however, agree to give

a taped statement in Sweeney's car. Sweeney, therefore, sent to New Haven for a tape recorder, which was delivered in about fifteen minutes. When the tape recorder arrived, Sweeney and the defendant entered the front seat of Sweeney's car and Detective Sergeant Robert P. Lillus sat in the rear. When the tape recorder was turned on, the defendant stated that he was voluntarily giving the statement, that he was not under the influence of liquor or drugs, that he was not being detained, that he had been advised of, and understood, his constitutional rights and that he had signed a waiver of those rights. He, thereafter, again confessed to having shot the victim. Shortly after the statement was completed the defendant was arrested and taken to New Haven police headquarters.

The search of the defendant's home on May 19 yielded a .357 caliber handgun. A ballistics test revealed that it was not the gun used in the shooting. Subsequent to May 19, the police obtained another search warrant for the defendant's residence. During the execution of the second warrant they discovered and seized a .38 caliber revolver. A ballistics test proved that the .38 caliber revolver had fired the bullets that had killed the victim.

At the time of the events in question the defendant was eighteen years old and was employed as a roofer for a company in East Haven. His mother, who lived in Florida and had seen the defendant only twice in the previous two years,[4] testified that she was not sure the defendant had completed the ninth grade and that she "believed" that he was at a fifth or sixth grade level at the time he terminated his formal education. She also testified that the defendant had difficulty reading and writing and in comprehending things that were read

[4] The defendant's mother also stated that she talked to the defendant by telephone once a month when he would call her at her place of employment in Florida.

or said to him. She stated that the defendant had been diagnosed as having a learning disability and had been in special education classes since the first grade. The defendant had acknowledged, when questioned by Cartocetti during his first visit to police headquarters, however, that he could read, write and understand English.

Prior to trial, the defendant filed a motion to suppress his statements to the police and to suppress any evidence seized pursuant to the search warrants, including the .38 caliber handgun found to be the murder weapon, because the search warrants had been issued on the basis of his allegedly illegally obtained statements. See *Wong Sun* v. *United States,* 371 U.S. 471, 486, 83 S. Ct. 407, 9 L. Ed. 2d 441 (1963). The trial court denied the defendant's motion in its entirety and allowed the state at trial to introduce the statements made to Cartocetti and Sweeney as well as the evidence seized pursuant to the search warrants.[5]

I

The defendant claims in this appeal that the trial court erred in denying his suppression motion because his statements were obtained while he was in custody without probable cause in violation of the fourth amendment, that any waivers of his *Miranda* rights were not knowing, voluntary and intelligent, and that his statements were involuntary. We disagree.

A

The defendant first claims that he was continually in custody throughout the night of May 19, from the moment he entered Ponteau's police car for the ride from his home in East Haven to police headquarters in New Haven. He argues, therefore, that the trial court should have suppressed the statement given to Car-

[5] No question has been raised on this appeal concerning the sufficiency of the probable cause to issue the search warrants.

tocetti at New Haven police headquarters and the statements given to Sweeney outside the defendant's residence in East Haven because on both occasions he was in police custody without probable cause.

The state appears to concede that there was no probable cause to arrest the defendant until after he had admitted the crime. The state claims, however, that the defendant was not in custody until he was formally arrested after giving his taped confession to Sweeney. The question, therefore, is whether the defendant was in custody without probable cause at any time prior to his formal arrest. We agree with the state that the defendant was not in custody at New Haven police headquarters or when he gave his initial unrecorded admission to Sweeney. We cannot agree, however, that the defendant was not in custody after he had admitted the murder to Sweeney and was placed in the police car to give a taped confession. At that point in time a reasonable person certainly would not have felt free to leave. See *State* v. *Acquin,* 187 Conn. 647, 655–56, 448 A.2d 163 (1982), cert. denied, 463 U.S. 1229, 103 S. Ct. 3570, 77 L. Ed. 2d 1411 (1983). By that time, however, there was probable cause to arrest the defendant. He also had been given *Miranda* warnings, and he had validly waived his *Miranda* rights. Part B, infra.

It is well established that statements obtained through custodial interrogation following the seizure of a person without probable cause, in violation of the fourth amendment, should be excluded unless intervening events break the causal connection between the arrest and the confession. *Taylor* v. *Alabama,* 457 U.S. 687, 690, 102 S. Ct. 2664, 73 L. Ed. 2d 314 (1982); *Dunaway* v. *New York,* 442 U.S. 200, 216, 99 S. Ct. 2248, 60 L. Ed. 2d 824 (1979); *Brown* v. *Illinois,* 422 U.S. 590, 600–604, 95 S. Ct. 2254, 45 L. Ed. 2d 416 (1975); *State* v. *Young,* 191 Conn. 636, 651, 469 A.2d 1189 (1983). "A person is in custody only if, in view

of all the surrounding circumstances, a reasonable person would have believed he was not free to leave. *United States* v. *Mendenhall,* 446 U.S. 544, 553–54, 100 S. Ct. 1870, 64 L. Ed. 2d 497, reh. denied, 448 U.S. 908, 100 S. Ct. 3051, 65 L. Ed. 2d 1138 (1980); *State* v. *Hoeplinger,* 206 Conn. 278, 287, 537 A.2d 1010 (1988)." *State* v. *Pittman,* 209 Conn. 596, 608, 553 A.2d 155 (1989). "[T]he ultimate inquiry is simply whether there is a 'formal arrest or restraint on freedom of movement' of the degree associated with a formal arrest. [*Oregon* v. *Mathiason,* 429 U.S. 492, 495, 97 S. Ct. 711, 50 L. Ed. 2d 714 (1977)]." *California* v. *Beheler,* 463 U.S. 1121, 1125, 103 S. Ct. 3517, 77 L. Ed. 2d 1275 (1983).

"The trial court's determination that the defendant was not in custody is a finding of fact. *State* v. *Ostroski,* 186 Conn. 287, 292, 440 A.2d 984, cert. denied, 459 U.S. 878, 103 S. Ct. 173, 74 L. Ed. 2d 142 (1982). That finding of fact by the trial court will not be overturned unless it is clearly erroneous. Id.; see Practice Book § 4061; *State* v. *Young,* [supra, 652]. We will, however, carefully review the record to ascertain whether the trial court's finding is supported by substantial evidence. *State* v. *Toste,* 198 Conn. 573, 580, 504 A.2d 1036 (1986); *State* v. *Alexander,* 197 Conn. 180, 185, 496 A.2d 486 (1985)." *State* v. *Pittman,* supra, 606.

Our prior recitation of the facts demonstrates that at New Haven police headquarters on May 19, 1987, the defendant acknowledged that he had voluntarily come to the station to assist the police in their investigation and that he was not being held against his will. He also acknowledged that he had been told that he was not under arrest and that he could stop answering questions and leave at any time. Those acknowledgments coupled with the circumstance that, after giving an exculpatory statement, the defendant and his aunt were, in fact, driven home, lends strong support

to the trial court's implicit finding that the defendant was not in custody at New Haven police headquarters.[6] It is difficult to conceive of a "reasonable man" who would not feel free to leave after having been told so many times and in so many different ways that he could. See *Berkemer* v. *McCarty,* 468 U.S. 420, 442, 104 S. Ct. 3138, 82 L. Ed. 2d 317 (1984); *Oregon* v. *Mathiason,* supra, 495.

A person, even if a suspect in a crime, is not in custody every time he is asked questions at a police station. *California* v. *Beheler,* supra, 1125; *Oregon* v. *Mathiason,* supra; *State* v. *Pittman,* supra, 607. In this instance the trial court had before it substantial evidence that the defendant was "free to leave" New Haven police headquarters at any time and was, therefore, not in custody. Consequently, we cannot say that the trial court was clearly erroneous in so finding.[7] See *State* v. *Pittman,* supra, 606; *State* v. *Young,* supra, 652.

The same reasoning applies to the question of whether the defendant was in police custody without probable cause at the time he gave his initial unrecorded admission to Sweeney outside the defendant's residence in East Haven on May 19, 1987. On that occasion the

[6] The trial court did not make specific findings but denied the defendant's motion to suppress without opinion. In view of the evidence and the focus of the arguments of counsel on this issue in the trial court and on appeal, however, it is implicit that the trial court found the defendant was not in custody, at least until after he had made his initial unrecorded confession to Sweeney. *State* v. *Jones,* 193 Conn. 70, 79, 475 A.2d 1087 (1984); see also *State* v. *McCarthy,* 197 Conn. 247, 258, 496 A.2d 513 (1985).

[7] The defendant attempts to make much of the fact that neither he nor his aunt had an automobile at police headquarters and that he was at the mercy of the police for transportation. There is nothing in the record, however, to indicate that Cartocetti would not have heeded the defendant's request to depart at any time and drive him and his aunt home. "When the individual has not been arrested, a finding of 'custody' requires some indication that the officer would not have heeded his or her request to depart." *Patterson* v. *Cuyler,* 729 F.2d 925, 929 (3d Cir. 1984).

defendant agreed to accompany Sweeney outside to talk while his residence was being searched. The two, thereafter, walked down the driveway toward Sweeney's car. The defendant was not handcuffed or restrained in any way. When they arrived at Sweeney's car, the defendant declined Sweeney's invitation to sit in the car, apparently preferring to remain standing outside. It is significant that Sweeney acquiesced to the defendant's preference. It is also significant that while speaking with Sweeney the defendant returned unaccompanied to the house to obtain a jacket and returned unaccompanied to continue the conversation. That activity clearly does not indicate the "restraint on freedom of movement" associated with a formal arrest. *Oregon* v. *Mathiason,* supra, 495. Further, even after he had confessed, the defendant acknowledged to Sweeney that he was not being detained. Although at that point he may have been mistaken, his subjective belief that he was not in custody is of "special significance" in assessing the degree of restraint previously imposed. *State* v. *Derrico,* 181 Conn. 151, 159, 434 A.2d 356, cert. denied, 449 U.S. 1064, 101 S. Ct. 789, 66 L. Ed. 2d 607 (1980). With the evidence it had to consider, we cannot say that the trial court was clearly erroneous when it implicitly determined that the defendant was not in custody at the time he gave his initial unrecorded admission to Sweeney. *State* v. *Young,* supra, 652; see also *State* v. *Jones,* 193 Conn. 70, 79–80, 475 A.2d 1087 (1984).

Obviously, after the defendant had admitted the commission of the crime, Sweeney had probable cause to take him into custody and, in fact, did so by placing him in the police car. *State* v. *Acquin,* supra, 655–56. By that time, however, as previously noted, the defendant had been given his *Miranda* warnings on several occasions and had executed a written waiver of his *Miranda* rights.

## B

Next, the defendant claims that any waivers of his *Miranda* rights secured by the New Haven police were invalid because he did not voluntarily, knowingly and intelligently waive those rights. He also claims that the statements he gave the police were involuntary. He does not argue that *Miranda* warnings were not given or that they were untimely or incomplete, or that the police used excessive or oppressive physical force or psychological ploys to extract his waivers or his statements. The defendant's argument appears to be, rather, that his waivers were invalid and his statements involuntary because, under the circumstances, his low intellect and lack of comprehension made it impossible for him to execute a valid waiver or to resist the police pressure to confess. We disagree.

To be valid, a waiver must be voluntary, knowing and intelligent. *Miranda* v. *Arizona,* 384 U.S. 436, 475, 478, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966); *State* v. *Gonzalez,* 206 Conn. 213, 217, 537 A.2d 460 (1988); *State* v. *Boscarino,* 204 Conn. 714, 743, 529 A.2d 1260 (1987). The state has the burden of proving by a preponderance of the evidence that the defendant voluntarily, knowingly and intelligently waived his *Miranda* rights. *State* v. *Hernandez,* 204 Conn. 377, 395, 528 A.2d 794 (1987); *State* v. *Chung,* 202 Conn. 39, 48, 519 A.2d 1175 (1987); *State* v. *Smith,* 200 Conn. 465, 481, 512 A.2d 189 (1986). Whether a purported waiver satisfies those requirements is a question of fact that depends on the circumstances of the particular case. *North Carolina* v. *Butler,* 441 U.S. 369, 374–75, 99 S. Ct. 1755, 60 L. Ed. 2d 286 (1979); *Johnson* v. *Zerbst,* 304 U.S. 458, 464, 58 S. Ct. 1019, 82 L. Ed. 2d 1461 (1938); *State* v. *Boscarino,* supra; *State* v. *Chung,* supra.

In support of his argument that he was intellectually incapable of making a voluntary, knowing and intelligent waiver of his *Miranda* rights the defendant presented only the testimony of his mother. As previously indicated, she testified that the defendant had a learning disability, that she was not sure that he had completed the ninth grade,[8] and that she "believed" he was functioning at a fifth or sixth grade level when he left school. It was her opinion that the defendant would have difficulty comprehending some of the words employed by the detectives in warning the defendant of his rights and in interrogating him. His mother, however, had seen the defendant only twice in the previous two years. Her testimony, if it is entitled to any weight, is certainly not determinative of the defendant's ability to execute a knowing and intelligent waiver. See *State* v. *Gonzalez,* supra, 218; *State* v. *Boscarino,* supra, 744. Even some degree of mental retardation does not by itself prevent a defendant from knowingly and intelligently waiving his *Miranda* rights. *Dunkins* v. *Thigpen,* 854 F.2d 394, 400 (1988), cert. denied, 489 U.S. 1059, 109 S. Ct. 1329, 103 L. Ed. 2d 597 (1989); see also *State* v. *Madera,* 210 Conn. 22, 45, 554 A.2d 263 (1989), and cases cited therein; *State* v. *Boscarino,* supra, 744; *State* v. *DeAngelis,* 200 Conn. 224, 235, 511 A.2d 310 (1986); *State* v. *Toste,* supra, 579.

The trial court had before it evidence that despite any intellectual shortcomings the defendant was employed as a roofer and that he commuted to work on public transportation. There was also evidence that the defendant's *Miranda* rights were read to him on at least three occasions and that he understood them each time they were read and that he signed a written waiver of those rights. "A defendant's express written and oral waiver is 'strong proof' that the waiver is valid. *North Carolina* v. *Butler,* supra [373]; *State* v. *Derrico,* [supra,

---

[8] The defendant told Cartocetti that he had completed the tenth grade.

164]." *State* v. *Chung,* supra, 50–51. Further, the record reveals that the defendant responded appropriately to the questions addressed to him concerning his rights and also to questions concerning the crime propounded to him by the police. In short, there was substantial evidence from which the trial court could have found that the defendant was capable of and did in fact voluntarily, knowingly and intelligently waive his *Miranda* rights. That finding will be reversed only if the trial court was clearly erroneous. *United States* v. *Alderdyce,* 787 F.2d 1365, 1368 (9th Cir. 1986). It was not.[9]

The state must also prove the voluntariness of the defendant's statements by a preponderance of the evidence. *Lego* v. *Twomey,* 404 U.S. 477, 489, 92 S. Ct. 619, 30 L. Ed. 2d 618 (1972); *State* v. *Barrett,* 205 Conn. 437, 451–52, 534 A.2d 219 (1987); *State* v. *Chung,* supra, 53. A review of the record reveals it to be devoid of any indication of threats or coercion or any overt psychological pressure applied by the police. It appears from the record, moreover, that the various interrogations of the defendant were conducted in a most circumspect and considerate manner by the New Haven officers. Since there were no coercive police tactics employed, any federal constitutional claim of the defendant is foreclosed by *Colorado* v. *Connelly,* 479 U.S. 157, 164, 107 S. Ct. 515, 93 L. Ed. 2d 473 (1986). That case required " 'police overreaching' as the 'crucial element' in any inquiry into 'constitutional "voluntariness." ' " *State* v. *Gonzalez,* supra, 222. Further, in this case it is not necessary to decide whether article first, § 8 of the Connecticut constitution bestows some greater protection upon the defendant than that derived from our federal constitution as construed in

___

[9] Again, the trial court did not make specific findings. It would, however, have had to find valid waivers before allowing the defendant's confession into evidence. See *State* v. *Jones,* 193 Conn. 70, 79, 475 A.2d 1087 (1984).

*Connelly.* "Because '[w]e find no persuasive evidence of involuntariness on the present record'; *State* v. *Barrett,* supra, 452; we do not decide whether statements characterized as involuntary by reason of their being motivated by factors *other* than police coercion, are inadmissible under our state constitution." (Emphasis in original.) *State* v. *Gonzalez,* supra.[10]

Further, the record fails to disclose that the defendant suffered from so disabling an educational, intellectual or psychological deficit that his will was overborne simply because he was in the presence of police. *State* v. *Barrett,* supra, 453. "The question of voluntariness is one of fact for determination by the trial court in the exercise of its discretion, subject to the constitutional standards of due process." Id., 452; *State* v. *Derrico,* supra, 162–63. The trial court did not abuse that discretion.

## II

The defendant next claims that he was deprived of a fair trial because of misconduct by the prosecutor. He argues that because the state's attorney, in his closing argument, "implicitly drew a comparison" between the defendant and "Son of Sam" and Charles Manson,[11] he was deprived of his due process right to a fair trial. He claims, therefore, that the trial court erred in denying his motion for a new trial.

In his closing argument to the jury the prosecutor stated, "You look at people, I'm certainly not putting this defendant in the class of a Son of Sam or a Charles Manson, but you have to look at those things that are

---

[10] The defendant did not, in his brief, specify whether he believed his statements were involuntary under the federal or state constitution or both. He, therefore, did not advance any arguments espousing different standards for state and federal claims of involuntariness.

[11] "Son of Sam" and Charles Manson are two of the more notorious murderers of recent times.

on TV all the time and [say] there [are] some pretty weird people, they were guilty of murder, they had the ability, form the intent and kill somebody, Son of Sam did, Charles Manson, a lot of them."

The state's argument, however, was in direct response to the defendant's prior argument that, having no motive to kill DuPaul,[12] he was either extremely emotionally disturbed or had no intent to cause death and consequently was guilty only of manslaughter. The state's argument was obviously calculated to underscore for the jury the state's contention that some murders are irrational and are committed by persons with no ostensible motive. The prosecutor specifically eschewed any attempt to equate the defendant with the likes of "Son of Sam" or Charles Manson. In the context in which it was made, therefore, we cannot conclude that the state's argument was improper let alone a violation of the defendant's right to a fair trial.

Even if the argument were improper, on appeal the burden is on the defendant to prove that he was denied a fair trial as a result. *State* v. *Ubaldi,* 190 Conn. 559, 575, 462 A.2d 1001, cert. denied, 464 U.S. 916, 104 S. Ct. 280, 78 L. Ed. 2d 259 (1983). Reviewing courts do not focus on the culpability of the prosecutor but rather on the fairness of the trial in view of the entire record. *State* v. *Williams,* 204 Conn. 523, 538, 529 A.2d 653 (1987). Improper comments by the state's attorney will not constitute error unless they are so prejudicial that they taint the entire proceeding. *State* v. *Glenn,* 194 Conn. 483, 492, 481 A.2d 741 (1984). The challenged remarks in this instance constituted only a brief, isolated portion of the state's final argument. The comments were not calculated to lead the jury to believe it was sitting in judgment on a serial killer or a mass

---

[12] The defendant, when asked by Sweeney for his reason for killing the victim, replied, "For something to do."

murderer, but to make a legitimate point in response to an opposing argument. Even if ill-advised, it is difficult to see how the remarks could have been interpreted otherwise or have so prejudiced the jury as to require a mistrial. The trial court did not abuse its discretion in denying the defendant's motion for a new trial.[13] *State* v. *Fullwood,* 194 Conn. 573, 584, 484 A.2d 435 (1984).

There is no error.

In this opinion the other justices concurred.

[13] The trial court also refused to give a curative instruction, stating, "I don't think that there was anything strong enough certainly in this case to warrant a mistrial or even comment to the jury aside from my instructions." The trial court has the best vantage point for assessing harmfulness and determining whether an explicit curative instruction is appropriate. We will not disturb that decision unless it was a clear abuse of the trial court's discretion. See *State* v. *Glenn,* 194 Conn. 483, 493, 481 A.2d 741 (1984).