## STATE OF CONNECTICUT *v.* MIGUEL ROMAN
## (14073)

PETERS, C. J., CALLAHAN, BORDEN, BERDON and NORCOTT, Js.

Argued September 23—decision released November 17, 1992

*Margaret P. Levy,* for the appellant (defendant).

*Mitchell S. Brody,* assistant state's attorney, with whom, on the brief, were *John M. Bailey,* state's attorney, and *John Massameno,* assistant state's attorney, for the appellee (state).

PETERS, C. J. The principal issue in this criminal appeal is whether, in the absence of a continuous word-

for-word translation of English into Spanish, the trial court should have suppressed, as coerced and involuntary, the inculpatory statements elicited during a custodial interrogation of the defendant, Miguel Roman, a Spanish speaking person. A jury found the defendant guilty of the crime of murder in violation of General Statutes § 53a-54a,[1] and the trial court sentenced him to a term of imprisonment of sixty years. He appeals from the judgment of conviction to this court pursuant to General Statutes § 51-199 (b). We affirm the judgment of the trial court.

The jury could reasonably have found the following underlying facts in support of its ultimate finding that the defendant had strangled the victim. The victim was the defendant's girlfriend and was pregnant with his child. The defendant had tried, unsuccessfully, to persuade the victim either to have an abortion or to go elsewhere to give birth.

Around 8:30 p.m. on Sunday, January 3, 1988, a neighbor heard sounds of a physical confrontation coming from the vicinity of the apartment where the victim was staying. At the same time, another observer at the site of the apartment saw a car resembling that owned by the defendant.

On Monday, January 4, 1988, a friend was asked, if questioned, to say falsely that she had been with the defendant and Nestor Torres, at a place other than the victim's apartment, for a period of time including the relevant evening. That day, Torres and the defendant drove to the victim's apartment, where the defendant nervously approached the door of the apartment, and, without entering, reported having heard running water.

---

[1] General Statutes § 53a-54a provides, in relevant part: "MURDER. (a) A person is guilty of murder when, with intent to cause the death of another person, he causes the death of such person . . . ."

The victim's body was found on Tuesday, January 5, 1988. The medical examiner concluded that the victim had been physically assaulted and had then been asphyxiated with a heater cord tied around her neck. He placed the time of death at approximately 8 p.m. on January 3, 1988.

The defendant gave the police conflicting information about when he was last in the company of the victim. During the trial, he made a full confession to someone with whom he was sharing incarceration facilities about the circumstances leading to the crime and about his killing of the victim.

In the defendant's appeal from his conviction for murder, he has raised two contentions that are cognizable on the present record. He maintains that he is entitled to a new trial because the trial court wrongfully: (1) admitted into evidence his postarrest statement to the police; and (2) permitted the state to open its case-in-chief after it had rested.[2]

I

At his trial, the defendant sought to suppress three sets of statements that he had made to the police, two of which antedated his arrest, and one of which postdated his arrest. He claimed that these statements were inadmissible because his command of English was so inadequate that his formal waiver of his constitutional rights under *Miranda* v. *Arizona,* 384 U.S. 436, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966), was ineffective and his statements were constitutionally involuntary. He asserted that only a continuous full translation of the

---

[2] The defendant's claim of ineffective assistance of counsel must await an appropriate factual record, which can only be developed pursuant to a petition for habeas corpus. *State* v. *Leecan,* 198 Conn. 517, 541–42, 504 A.2d 480, cert. denied, 476 U.S. 1184, 106 S. Ct. 2922, 91 L. Ed. 2d 550 (1986); see also *State* v. *Walker,* 215 Conn. 1, 9, 574 A.2d 188 (1990).

investigatory proceedings into Spanish would have sufficed to meet the requirements of federal constitutional law.

In the present appeal, the defendant's argument is more limited. His constitutional attack is limited to the admissibility of the statement elicited in his postarrest custodial interrogation. With regard to that interrogation, he no longer challenges the validity of his *Miranda* waiver. He maintains, instead, that because he received *Miranda* warnings in Spanish and signed the *Miranda* waiver in Spanish, it was unconstitutionally coercive, and a violation of his federal due process rights,[3] to have the subsequent interrogation conducted in English.

The defendant was interviewed twice by the police before his arrest. On the first occasion, January 6, after having been advised orally, in English, of his *Miranda* rights, he said that he had not seen the victim after the Wednesday before her death. Two days later, he was again questioned after having received *Miranda* warnings in both Spanish and English. On that occasion, in the presence of Jose Morales, a Spanish speaking police officer, he acknowledged having seen the victim at a party on Saturday, January 2, 1988. During the same interview, the defendant inaccurately described his whereabouts on the afternoon of Sunday, January 3, 1988. The defendant also represented that Torres had borrowed his car from that Sunday afternoon to the next morning, a representation immediately contradicted by Torres.

The defendant's postarrest custodial interrogation, on June 10, 1988, began with a reading of the defendant's *Miranda* rights in English and Spanish. Morales,

---

[3] Neither at trial nor in this court has the defendant raised an independent claim under the due process clause of article first, § 8 of the Connecticut constitution.

speaking in Spanish, then reviewed the waiver of rights form with the defendant. The defendant signed the waiver form in its Spanish version. Although Morales was continuously available for translation during the interrogation, the subsequent questioning proceeded in English. The defendant asked Morales to translate some questions into Spanish, and answered questions both in English and in Spanish. He continued to deny having seen the victim on the day of her death. He claimed to have spent Sunday evening shopping with his father and then playing dominoes at home. Near the end of the questioning, he replied affirmatively when asked by Morales, in Spanish, whether he had understood everything that had been asked of him.

At the suppression hearing challenging the admissibility of the statement elicited from the defendant during police interrogation, he testified, through an interpreter, about his lack of familiarity with the English language. Although he acknowledged that he had completed the ninth grade at Hartford High School, he indicated that his school work had been in bilingual courses. He did not state that he had been confused about the meaning of any of the questions put to him at his postarrest custodial interrogation. The state countered with the testimony of George Lopez, who had known the defendant for several years and who told the court that, while the defendant could not speak English well, he had no difficulty understanding what was said to him in English. On this record, amplified by the trial court's personal observation that the defendant had not routinely availed himself of the interpreter who was available to him during the trial, the trial court concluded that the defendant was conversant in English even though his primary language was Spanish. It therefore concluded that all of his statements to the police were admissible.

The first question for this court is whether the trial court made a finding of fact that was clearly erroneous when it determined that the defendant had a sufficient command of the English language to participate knowingly and willingly in his interrogation by the police. We conclude that the record provides ample support for the trial court's finding. Indeed, the record contains nothing specifically to the contrary. Although counsel indicated doubts about the defendant's linguistic capacity to respond to questioning about his conduct, statements of counsel are not evidence. *State* v. *Tillman,* 220 Conn. 487, 496, 600 A.2d 738 (1991), cert. denied, U.S. , 112 S. Ct. 3000, 120 L. Ed. 2d 876 (1992); *State* v. *Aillon,* 202 Conn. 385, 391, 521 A.2d 555 (1987). The fact that the police had the defendant execute a *Miranda* waiver in Spanish, to assure the defendant's understanding of his constitutional right to refuse to participate in the interrogation, does not demonstrate that the defendant, with the assistance of Morales, could not comprehend ordinary questioning in English about recent events in his personal life.

Once this factual question is resolved against the defendant, little remains of his contention that the trial court could not reasonably have found his statements voluntary and uncoerced. The defendant has not challenged either the linguistic competency of Morales to act as an interpreter or his unlimited access to Morales' services as an interpreter during the entire postarrest interrogation. The defendant's factual claim of supervening linguistic impairment is inconsistent with his acknowledgment, in Spanish, toward the end of the taped recording of his interview, that he had fully understood what had transpired. In these circumstances, the trial court could reasonably have concluded, by a preponderance of the evidence; *State* v. *Northrop,* 213 Conn. 405, 419, 568 A.2d 439 (1990); that conducting the defendant's questioning in English was

not constitutionally defective. The facts developed on this record do not show, as federal constitutional law requires, that the conduct of the police coerced the defendant into making incriminatory statements. See *Colorado* v. *Connelly,* 479 U.S. 157, 167, 107 S. Ct. 515, 93 L. Ed. 2d 473 (1986); *State* v. *Northrop,* supra; *State* v. *Gonzalez,* 206 Conn. 213, 222, 537 A.2d 460 (1988).

To the extent that the defendant's claim on appeal can be understood as suggesting that, because of his linguistic impairment, the federal constitution required continuous interpretation during his custodial interrogation, we reject such a contention. The federal due process clause requires continuous translations at trial when a non-English speaking defendant cannot understand or appreciate the proceedings. *Luna* v. *Black,* 772 F.2d 448, 451 (8th Cir. 1985); *United States ex rel. Negron* v. *New York,* 434 F.2d 386, 389 (2d Cir. 1970); cf. 28 U.S.C. § 1827 (1988) (Court Interpreters Act). Failure to provide continuous word-for-word translation will render a trial fundamentally unfair, however, "only on a showing of abuse." *Valladares* v. *United States,* 871 F.2d 1564, 1566 (11th Cir. 1989); see also *United States* v. *Joshi,* 896 F.2d 1303, 1309 (11th Cir.), cert. denied sub nom. *Panchal* v. *United States,* 498 U.S. 986, 111 S. Ct. 523, 112 L. Ed. 2d 534 (1990). On at least one occasion, a federal court has extended to pretrial hearings the requirement of continuous translations for criminal defendants who cannot understand or appreciate the proceedings. *United States* v. *Cirrincione,* 780 F.2d 620, 634 (7th Cir. 1985). We need not consider whether to follow the federal Circuit Court's extension of the continuous translation rule, however, because here the trial court found that the defendant was "conversant with the English language," "comport[ed] himself fairly well in the English language," and "sat through most of the trial without the active use of the interpreter." See id., 634–35 (lack of inter-

preter at pretrial hearings did not violate due process because defendant could understand and speak English and rarely used the interpreter provided at trial). Because the trial court's finding about the defendant's linguistic capacity was not clearly erroneous, his claim of impairment of his due process rights must fail.

## II

The defendant's alternate claim for a new trial challenges the validity of the trial court's exercise of its discretion to permit the state to open its case against the defendant, after both the state and the defendant had rested, to present the testimony of Ioannis Merkouris, with whom the defendant had been confined during the defendant's trial. The record does not indicate whether the defendant had orally moved for acquittal in advance of the state's motion, but it is conceded that he had filed no written motion for acquittal and never advanced any formal argument claiming an evidentiary insufficiency in the case against him.

The testimony offered by the state was evidence of a confession by the defendant to Merkouris, who had been confined to the same prison cellblock as the defendant during the defendant's trial.[4] Merkouris testified, over the defendant's objection, that the defendant had told him that he was angry with the victim and that he had gone to the victim's apartment with the intention of killing her. The defendant further had told him that he had encountered a black male at the victim's apartment upon his arrival, that the victim had refused to identify this other person after his departure, and that he had then killed the victim.

---

[4] The state represented to the court, on May 18, 1990, immediately before the defendant rested, that it had only the previous day learned of the existence of Merkouris. The defendant has not contested the accuracy of the state's representation that it had had no prior knowledge of the existence of this witness or of the testimony that he was prepared to offer.

The issue before this court is whether the trial court abused its discretion in allowing the state to open its case to present the testimony of Merkouris after both the state and the defendant had rested. Our cases have indicated that, except in special circumstances, appellate courts should generally defer to the trial court's judgment in resolving the admissibility of evidence offered after the parties have rested. See *State* v. *Greene,* 209 Conn. 458, 475, 551 A.2d 1231 (1988); *State* v. *Allen,* 205 Conn. 370, 380, 533 A.2d 559 (1987); *State* v. *Brigandi,* 186 Conn. 521, 545–46, 442 A.2d 927 (1982). Unless the state's offer seeks to fill an evidentiary gap in its prima facie case that was specifically called to the state's attention by the defendant's motion for acquittal; see *State* v. *Allen,* supra, 385; the trial court may permit additional evidence to be presented even though that evidence strengthens the case against the defendant. *State* v. *Watson,* 165 Conn. 577, 345 A.2d 532 (1973), cert. denied, 416 U.S. 960, 94 S. Ct. 1977, 40 L. Ed. 2d 311 (1974). The defendant's contention that he did not have adequate time to prepare a cross-examination of this witness cannot be sustained when trial counsel failed to ask for a continuance. Accordingly, we conclude that the trial court did not abuse its discretion in allowing the state to open its case.[5]

The judgment is affirmed.

In this opinion CALLAHAN, BORDEN and NORCOTT, Js., concurred.

BERDON, J., dissenting. Like *Miranda* v. *Arizona,* 384 U.S. 436, 439, 86 S. Ct. 1602, 16 L. Ed. 2d 694

[5] To the extent that the defendant intends to raise, as a separate issue, that he was unable effectively to impeach this belatedly identified witness, we conclude that this contention has no merit. The defendant could have asked the trial court for a continuance, but he did not do so. In the absence of such a request, we have no basis for concluding that his opportunity for impeachment was unjustifiably impaired.

(1966), this case raises "questions which go to the roots of our concepts of American criminal jurisprudence: the restraints society must observe consistent with the Federal Constitution in prosecuting individuals for crime." More specifically, at issue in this case is whether the custodial interrogation of a defendant, whose primary language is other than English, is admissible when he was questioned by the police without the benefit of a continuous word-for-word translation into his primary language and was compelled to respond in English. At stake is the defendant's federal constitutional right of due process.

Although the defendant moved to suppress at trial statements made during three interviews with the police, in which they failed to provide him with continuous word-for-word translation, his focus in this appeal is on the postarrest custodial interrogation of June 10, 1988. This statement was damaging because he gave varying explanations of his whereabouts in the days just prior to the death of the victim, which tended to incriminate him. The defendant puts his claim in a capsule as follows: "In this case, custodial interrogation followed an arrest by warrant on a murder charge, after a five month investigation by police officers who knew the defendant was primarily Spanish speaking. Under these circumstances, continuous translation should have been provided in order to comply with fundamental fairness and procedural due process under the Fourth, Fifth, and Fourteenth amendments."

The case law is sparse on the defendant's right to continuous translation during custodial interrogation when the defendant's primary language is other than English and he or she is unable fully to comprehend English. A plain reading of *Miranda*, however, compels me to conclude that not only must an accused voluntarily, knowingly and intelligently waive the right against self-incrimination, but the accused must also

be able to comprehend fully the questions posed during interrogation. Furthermore, it is equally imperative that the accused be able to respond intelligently to the police, which requires the ability to communicate in a language that the accused understands. Without this comprehension and ability to respond intelligently, the statements of the accused are not voluntary and the *Miranda* warnings become meaningless. Physical coercion and "the blood of the accused [are] not the only hallmark[s] of an unconstitutional inquisition." *Blackburn* v. *Alabama,* 361 U.S. 199, 206, 80 S. Ct. 274, 4 L. Ed. 2d 242 (1960). The requirement that defendants be interrogated in a language they fully comprehend is also a "matter of simple humaneness." *United States ex rel. Negron* v. *New York,* 434 F.2d 386, 390 (2d Cir. 1970).

Thus, in *State* v. *Cervantes,* 62 Wash. App. 695, 814 P.2d 1232 (1991), the court suppressed statements obtained from the interrogation of a Spanish speaking defendant because the police allowed a codefendant to translate for the defendant. The court noted that the potential personal bias of the codefendant's translation could limit the defendant's ability to understand fully the interrogator's questions and to express properly his answers on the record. The court held that the defendant's inability to communicate properly with the police and understand the interrogator's questions was unfair and violated the defendant's right to due process. Id., 701; see also *Vargas* v. *Brown,* 512 F. Sup. 271, 276 (D.R.I. 1981) (interrogation of Spanish speaking witness-suspect who had obvious difficulty speaking English criticized as a "scene worthy of Kafka or Orwell" and statements probably not knowingly and voluntarily given); *People* v. *Turkenich,* 137 App. Div. 2d 363, 369–70, 529 N.Y.S.2d 385 (1988) (holding that statements made during custodial interrogation of Russian speaking defendant, without evidence demonstrat-

ing that the translation was "sufficient to give the defendant an understanding of the police inquiry," were additional grounds to suppress the statements).

In this case, on June 10, 1988, five months after the crime was committed, the defendant was arrested at his place of employment and taken to police headquarters. At the time of the interrogation, the police knew from previous interviews that the defendant's primary language was Spanish and that the defendant had problems with the English language. On January 8, 1988, during the second interview, a Spanish speaking detective translated into Spanish most of the questions posed to the defendant. During this interrogation, the defendant occasionally asked for assistance when he was asked questions in English. Although the defendant completed ninth grade at Hartford High School in *bilingual* courses, it is clear that he had a poor command of the English language and this was readily admitted by the police officers who interrogated him.

The police officers' knowledge and their concern about the defendant's fluency in English is underscored by the manner in which they administered his *Miranda* warnings. During both the January 8 and June 10, 1988 interrogations, the police officers meticulously gave the defendant his *Miranda* warnings in Spanish. The defendant signed a waiver on both occasions that was written in Spanish. Indeed, Officer Ronald Faggaini further demonstrated this concern at the interrogation on June 10 when he stated to the Spanish speaking police officer the following: "Joe [the Spanish speaking officer], after each right, Joe make sure that Miguel [the defendant] understands each right."

The concern evidenced in administering the *Miranda* warnings did not spill over into the interrogation of the defendant. After the *Miranda* warnings were given in Spanish, the police officer insisted on interrogating him

in English. The following occurred: "Faggaini [police officer] — Listen, we are gonna try to talk, to talk in English, O.K.! O.K., if you don't understand what I am saying Joe will help in Spanish O.K. We talked to you before, O.K. so we are going to try to speak up so this thing can record."

Not content merely to deprive the defendant of continuous word-for-word translation, the police went a step further on June 10 when they prohibited him from answering in Spanish. Every time he lapsed into Spanish, the following occurred: "Joe [the Spanish speaking officer] to Miguel [the defendant] — Tell them in English, because if you don't they—unintelligible." Again, later in the interrogation: "Joe to Miguel — Tell them in English. Anything you want to tell them, tell them in English."

Furthermore, the tape recording of the interrogation admitted into evidence documents the defendant's attempt to communicate in Spanish.[1] The tape establishes that in the initial stages of the interrogation, after the detectives had requested that the defendant attempt to answer in English with the aid of Detective Morales' translation, the defendant persistently attempted to communicate in Spanish.[2]

---

[1] The transcript of the tape is incomplete because it only records Officer Morales' translations and does not include the defendant's other attempts to speak in Spanish.

[2] For example, one exchange proceeded as follows:

"Faggaini: . . . we spoke to you about the murder before."

[Conversation in Spanish between Joe and Miguel translated in the transcript as follows:]

"Joe: He says that he talked to you about the murder before.

"Miguel: Before, you know the same day (unintelligible)."

[Dialogue in Spanish between Miguel and Joe omitted from transcript.]

"Joe: He wants to know if you spoke to her on the day she was killed.

\* \* \*

"Faggaini [in English]: O.k. during that week we spoke to you before today, O.K."

[Answer in Spanish on tape recording translated in the transcript as follows:]

The majority relies upon the trial court's finding that the defendant "was conversant in English even though his primary language was Spanish," and concludes that the finding must be upheld unless it was "clearly erroneous."[3] The majority's analysis is flawed. The conclusion that the defendant could sufficiently comprehend and converse in the English language is inextricably involved with the voluntariness of the confession.[4] Although we normally give great deference

"Miguel: In my house."

Following the attempted dialogue in Spanish, Detective Faggaini again urged the defendant to respond in English:

"Faggaini: We are going to try to keep this in English because if we spoke to you in English we can understand each other. . . ."

Despite Faggaini's assertion that conducting the interrogation in English would improve everyone's understanding, the tape recording indicates that the defendant was having difficulty responding in English and was attempting to avail himself of Morales' translation.

[3] This court has previously held that "[a]lthough the issue [of whether waiver was voluntary] is therefore ultimately factual, our usual deference to factfinding by the trial court is qualified, on questions of this nature, by the necessity for a scrupulous examination of the record to ascertain whether such a factual finding is supported by substantial evidence." *State* v. *Harris,* 188 Conn. 574, 580, 452 A.2d 634 (1982), cert. denied, 460 U.S. 1089, 103 S. Ct. 1785, 76 L. Ed. 2d 354 (1983).

[4] Although the trial court characterized the statements made by the defendant during the June 10 interrogation as a "confession," for the purpose of determining admissibility, it is not necessary that they constitute a confession. "The privilege against self-incrimination protects the individual from being compelled to incriminate himself in any manner; it does not distinguish degrees of incrimination. Similarly, for precisely the same reason, no distinction may be drawn between inculpatory statements and statements alleged to be merely 'exculpatory.' If a statement made were in fact truly exculpatory it would, of course, never be used by the prosecution. In fact, statements merely intended to be exculpatory by the defendant are often used to impeach his testimony at trial or to demonstrate untruths in the statement given under interrogation and thus to prove guilt by implication. These statements are incriminating in any meaningful sense of the word and may not be used without the full warnings and effective waiver required for any other statement." *Miranda* v. *Arizona,* 384 U.S. 436, 476–77, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966); see *Rhode Island* v. *Innis,* 446 U.S. 291, 302 n.5, 100 S. Ct. 1682, 64 L. Ed. 2d 297 (1980); 1 C. McCormick, Evidence (4th Ed. 1992) c. 14, § 144, pp. 550–55.

to the factual findings of the trial court, the ultimate issue of whether the statement is voluntary and admissible is a legal determination. *Arizona* v. *Fulminate,* 499 U.S.    , 111 S. Ct. 1246, 1252, 113 L. Ed. 2d 302, reh. denied,    U.S.    , 111 S. Ct. 2067, 114 L. Ed. 2d 472 (1991). Accordingly, our standard of review is not whether the fact-finding of the trial court is "clearly erroneous," but whether, upon our review of the record, the state has proven that the incriminating statements were voluntarily made.[5]

Nevertheless, no matter what the standard of review should be in this case, the trial court should not have concluded that the statements given during the June 10 interrogation were admissible. A review of the totality of the record leads to the inescapable conclusion that the trial court's finding that the defendant had a sufficient command of the English language to comprehend the questions and respond intelligently was clearly erroneous.[6]

---

[5] Unfortunately, the majority of this court continues to follow the beat of the federal drummer by holding that the voluntariness of the confession need only be proved by a fair preponderance of the evidence and not by proof beyond a reasonable doubt. This burden of proof to determine the voluntariness of the confession offends our common law and our state constitution. *State* v. *Stanley,* 223 Conn. 674, 696–701, 613 A.2d 788 (1992) (*Berdon, J.,* dissenting).

[6] A review of the tape and the transcript indicates that the defendant was not able to respond intelligently to the questions, as illustrated by the following exchange:

"Faggaini: He didn't see Carmen get out of your van.

"Miguel: He see when he get out was there

"Faggaini: What do you mean?

"Miguel: Unintelligible."

The confusion evident in the following conversation also highlights the defendant's inability to respond intelligently to the questions:

"Faggaini: And Ruben is a boyfriend of Carmens[?]

"Miguel: Yeah, before

"Faggaini: Before[?]"

[Answer in Spanish on tape translated in the transcript as follows:]

"Miguel: I was see, you know, when I met her (unintelligible) understand, before I went out with her they were dating but they had split.

The majority further justifies its decision in part on the following two related grounds: (1) that if the defendant did not understand the police officers he could have consulted the interpreter who was available during the interrogation on June 10, 1988; and (2) that "the defendant had not routinely availed himself of the interpreter who was available to him during the trial." The simple answer for these claims is the following rhetorical question: how was the Spanish speaking defendant able to determine whether he understood the question in English and whether his response in English meant what he thought it meant, if in fact he did not have command of the English language? Moreover, the Second Circuit decision in *United States ex rel. Negron* v. *New York,* supra, should put to rest the two claims advanced by the majority to support its decision. The court stated that it was not "inclined to require that an indigent, poorly educated Puerto Rican thrown into a criminal trial as his initiation to our trial system, come to that trial with a comprehension that the nature of our adversarial processes is such that he is in peril of forfeiting even the rudiments of a fair proceeding unless he insists upon them." Id., 390.

Next, the majority claims that the defendant did not testify during the suppression hearing "that he had been confused" about the meaning of any question asked during the interrogation. Although there was

---

"Joe: O.K., this guy was going out with her before he was going out with her he . . .

"Faggaini: Same time you were?

"Miguel: Yeah.

"Faggaini: Was he."

[Question in Spanish on tape recording translated in the transcript as follows:]

"Miguel to Joe: *What is he saying[?]*" (Emphasis added.)

Significantly, the tape consistently indicates that when the defendant wished to initiate communication with the detectives, rather than respond to their questions, he chose to speak in Spanish.

some ambiguity in the defendant's testimony during the suppression hearing and confusion as a result of his language disabilities, the record indicates that the defendant did not understand many of the questions asked during interrogation by the officers.

Finally, the majority puts great weight on the testimony of the state's witness, George Lopez, who stated that he previously knew the defendant and that the defendant could understand English. This testimony must be put in the proper perspective—George Lopez was the victim's brother and had three criminal cases pending against him. Moreover, Lopez conceded that when he spoke to the defendant, he spoke in Spanish 60 percent of the time, and in English only 40 percent. Lopez testified that the defendant would sometimes ask him to repeat a question or statement in Spanish, but Lopez conveniently added, "He'd understand. He just want me to ask the question in Spanish." More important, however, Lopez' testimony must be looked at in the context of this case. The defendant's claim is not merely that he could not understand English, but also that he could not intelligently *converse* in English. Lopez testified that when he spoke to the defendant in English that the defendant would respond in Spanish. As Lopez' testimony explains, the times the defendant responded in English did not involve "big verbal conversation, you know, several words."

The state argues that even if the statement should have been suppressed, its admission is not reversible error under *Arizona* v. *Fulminante,* supra, because the state has proven its admission was harmless beyond a reasonable doubt. This was a thin case; the evidence for the state was not overwhelming. There was no physical evidence linking the defendant to the murder. The core evidence of the state was a "jailhouse confession" allegedly made by the defendant to a pretrial inmate during his trial. Surely, under these circumstances the

state has failed to meet its burden of proving that the admissibility of these damaging statements was harmless beyond a reasonable doubt.

The issue in this case boils down to an even more fundamental question—that is, the perception of justice. When the defendant's primary language is Spanish, and the police officers insist on conducting the interrogation in English, the entire process smacks of unfairness that will result in the perception by the Hispanic community that the criminal justice system is tilted against them. This is especially true in the present case in which a police officer, fluent in English and Spanish, was available and could have provided word-for-word translation for the defendant or could have conducted the interrogation in Spanish. Here, the police were so concerned about the defendant's comprehension that they directed the *Miranda* rights to be given in Spanish, knowing full well that without the translation into Spanish the voluntariness of the defendant's statement would be placed in jeopardy. Yet, in this case, the majority allows the state a roundabout run by upholding the validity of the subsequent interrogation conducted in English.

In order for the public to have confidence in our criminal justice system, it is important not only that we do justice but also that all racial and ethnic segments of our population perceive that justice is done. "In our system of justice, not only must the accused be afforded a fair trial, but equally important there must be a perception of fairness by the community and the accused. Anything less not only undermines the credibility of this branch of government but also threatens the very fabric of our democracy." *State* v. *Tillman,* 220 Conn. 487, 514–15, 600 A.2d 738 (1991) (*Berdon, J.,* dissenting), cert. denied,    U.S.    , 112 S. Ct. 3000, 120 L. Ed. 2d 876 (1992). Indeed, almost forty years ago Justice Frankfurter wrote that "justice must satisfy

the appearance of justice." *Offutt* v. *United States,* 348 U.S. 11, 14, 75 S. Ct. 11, 99 L. Ed. 11 (1954). And although the practice and perception of justice involve a variety of levels of government—the police officer, the state's attorney and the trial judge—to a great extent this court determines for our state residents how rich or thin that justice and perception of justice will be viewed. Unfortunately, the majority opinion today rolls so thin the perception of justice that it develops serious cracks.

The defendant failed to raise any state constitutional issues. Nevertheless, that should not prevent this court from adopting a rule that would ensure the reliability of statements obtained during custodial interrogation of a defendant whose primary language is not English. Where an "issue is of such vital importance to our real and perceived adherence to the rule of law, [we may] in the exercise of our inherent supervisory authority over the administration of justice" require a rule that gives more rights than that of the federal court. *State* v. *Holloway,* 209 Conn. 636, 645–46, 553 A.2d 166, cert. denied, 490 U.S. 1071, 109 S. Ct. 2078, 104 L. Ed. 2d 643 (1989). Indeed, this issue before us today should reach that level of concern.

Accordingly, I would hold that before a statement resulting from custodial police interrogation can be introduced, a defendant whose primary language is other than English must be advised in his or her primary language of the following rights: (1) to continuous word-for-word interpretation in that language; and (2) to respond in that language, or alternatively to be interrogated only in the defendant's primary language. I would further hold that for the state to take advantage of any waiver of this right, it must be proven that the waiver was voluntarily and intelligently made. Anything less would be unfair.